**Nawaf AYYOUB, Petitioner,**

v.

**IMMIGRATION & NATURALIZATION SERVICE, Respondent.**

No. 02–3679.

United States Court of Appeals,
Sixth Circuit.

March 25, 2004.

Before BATCHELDER, GIBBONS, and COOK, Circuit Judges.

GIBBONS, Circuit Judge.

In 1992, petitioner Nawaf Ayyoub—a native and citizen of Jordan—obtained conditional permanent resident status on the basis of his marriage to Cary Coen. After he and Coen divorced, Ayyoub independently filed an application for removal of the conditions on his permanent resident status and sought a waiver of the requirement that Coen join the application on the ground that he and Coen entered their marriage in good faith. An Immigration Judge ("IJ") found that Ayyoub failed to show that he and Coen married in good faith, denied his request for a waiver, and ordered him deported. The Board of Immigration Appeals ("BIA") affirmed the IJ's decision. Ayyoub seeks review of the BIA's determination that he failed to demonstrate that his marriage to Coen was in good faith and that he was therefore ineligible for a waiver. For the following reasons, we affirm the decision of the BIA.

I.

Ayyoub entered the United States as a visitor on September 7, 1990. He met Coen in November 1991 and married her approximately four months later on March 12, 1992. Coen soon thereafter filed an application with the Immigration and Naturalization Service ("INS") to change Ayyoub's status to that of a conditional permanent resident on account of their marriage. On August 24, 1992, the application was approved, and Ayyoub became a conditional permanent resident under 8 U.S.C. § 1186a(a).

Ayyoub and Coen filed a timely joint application for removal of the conditions on his permanent resident status (Form I–751) on July 1, 1994. Pursuant to 8 U.S.C. § 1186a(c)(1)(B), the INS conducted an in-

terview of Ayyoub and Coen on January 24, 1995. Ayyoub testified under oath that, during the two months preceding the interview, Coen had not been living with him. Ayyoub also noted that Coen had seen at least two other men while married to him, one of whom she had been living with off and on for the past month. He also testified that, during a business trip to Jordan, he became engaged to another woman. He further noted that "engagement in Jordan is just like marriage." Ayyoub claimed that he was forced into the engagement because of family pressure and that he divorced[1] the Jordanian woman after returning to the United States. He denied that he or anyone else ever paid Coen to marry him.

In a separate interview, Coen testified under oath that she had been paid $4,300.00 by Abraham Shuka, a friend of Ayyoub's, to marry Ayyoub and that her marriage to him was a "business marriage." She also testified that she did not live with Ayyoub until six or seven months after their marriage, and that, even then, she lived with him only on occasion. At the conclusion of the interview, she stated that she wanted to withdraw her signature from the I–751 application and signed a statement to this effect.

Immediately after Ayyoub's testimony, the INS denied his I–751 application on account of Coen's withdrawal and terminated his conditional permanent resident status as of August 24, 1994. The INS also initiated deportation proceedings against Ayyoub by serving him personally with an Order to Show Cause and a Notice of Hearing that alleged he was deportable under 8 U.S.C. § 1251(a)(1)(D)(i),[2] on the ground that his conditional permanent resident status had been terminated. Ayyoub denied the charge of deportability.

Ayyoub and Coen ultimately divorced in November 1995. On March 1, 1996, Ayyoub independently filed a second Form I–751 and, pursuant to 8 U.S.C. § 1186a(c)(4)(B), sought waiver of the requirement that he timely and jointly file the application with Coen on the basis that their now defunct marriage was entered into in good faith.[3] Finding that Ayyoub failed to make this showing, an INS district director denied his application on November 4, 1996. Ayyoub sought review of this denial pursuant to 8 U.S.C. § 1186a(c)(3)(D), arguing that the denial was in error and, in the alternative, for voluntary departure.

At a deportation hearing before an IJ on June 23, 1997, Ayyoub attempted to prove that he had married Coen in good faith and was therefore eligible for a waiver under 8 U.S.C. § 1186a(c)(4)(B). Ayyoub testified that he married Coen because he loved her. However, he admitted that he did not become aware that she worked as an adult dancer until nine months into their marriage. Ayyoub also admitted that he did not learn that Coen abused drugs until after a year of marriage.

As documentary evidence that they lived together as husband and wife, Ayyoub provided an affidavit from Iman Ozeir, his landlord, stating that Ayyoub and Coen

---

**1.** Ayyoub testified that a divorce is required to end an engagement in Jordan.

**2.** 8 U.S.C. § 1251(a)(1)(D)(i) has since been reclassified at 8 U.S.C. § 1227(a)(1)(D)(i). *See* Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub.L. No. 104–208, § 305(a)(2), 110 Stat. 3009, 3009–598 (Sept. 30, 1996).

**3.** Ayyoub also argued that he was entitled to a waiver under 8 U.S.C. § 1186a(c)(4)(A) on the basis that he would endure extreme hardship if forced to return to Jordan. The BIA ultimately denied this claim, and Ayyoub does not seek review of that denial.

lived together from 1992 to 1994. Ayyoub also submitted two rent receipts addressed to "Mr. and Mrs. Nawaf Ayyoub" dated March 13 and August 14, 1992. But Ayyoub admitted he and Coen lived separately about five or six times during the course of their marriage. He also conceded that, while they were married, Coen lived with at least two or three other men. Additionally, Ayyoub testified that, while married to Coen, he frequently traveled for business purposes, both overseas and within the United States, sometimes for six week periods. He estimated that he took ten to fifteen business trips a year during his marriage to Coen and, in 1993, was probably away more than he was at home. He also estimated that each trip lasted, on average, a month.

Ayyoub again confessed that, on a business trip to Jordan in 1993, he became engaged to another woman and that, in Jordan, engagement "is considered marriage." To explain the engagement, he stated that he secretly dated the woman before he came to America and, upon returning to Jordan, he was pressured into becoming engaged to the woman by his and her family because it had become known that they had secretly dated, which he claims jeopardized her reputation. Ayyoub reiterated that he divorced the Jordanian woman after returning to the United States.

In an attempt to show that he and Coen shared financial resources, Ayyoub claimed that he and she once shared a joint checking account. As evidence that they actually shared such an account, he produced a blank check that included both his and Coen's name and a bank statement of that account from 1992 that likewise included each of their names. Yet, he did not provide any canceled checks that included her signature or any evidence that she otherwise utilized the account. Moreover, Ayyoub admitted that he maintained a separate bank account. Although he claimed that he once purchased Coen a car, Ayyoub could not produce any evidence of this purchase or that he and Coen ever jointly owned any other substantial property. The only other evidence Ayyoub submitted indicating that he and Coen shared financial resources was a jointly filed tax return from 1992.

In an effort to discredit Coen's prior testimony that she had been paid to marry Ayyoub, Ayyoub submitted documents—including a sworn affidavit—signed by Coen in which she retracts her earlier testimony and attests that she initially married Ayyoub out of love. Coen, however, did not appear before the IJ to testify on Ayyoub's behalf, and Ayyoub did not subpoena her to testify.[4] Ayyoub denied that he or anyone else ever paid Coen to marry him.

Following Ayyoub's testimony, Special Agent Gregory Adducci of the INS testified on behalf of the agency. Adducci produced an affidavit signed by Coen in 1995 stating that she had been paid $4,3000.00 for marrying Ayyoub.[5] He also produced an affidavit from Salah Mohamed–Salah Zubaidi, a friend of Ayyoub's, stating that Ayyoub told Zubaidi he married Coen in order to obtain a green card.

Ayyoub then called a few more witnesses. Ahmed Ramadan testified he vis-

**4.** The INS obtained a subpoena for Coen but was unable to serve the subpoena on her because it was unable to locate her.

**5.** Adducci also produced affidavits signed by Kimberly Kincaide and Deanna Coen, Coen's sister. These affidavits and Adducci's testimony suggest that Cary Coen's marriage to Ayyoub was part of a larger fraudulent marriage scheme.

ited Ayyoub at his home occasionally and often saw Coen there. Then, as a last witness, Ayyoub called Coen's father, who testified that, in the summer of 1992, Coen introduced Ayyoub to him as her fiancee and that "[s]he led [him] to believe later down the road that they really cared for each other and stuff and that [Ayyoub] was really good to her."

On July 1, 1997, the IJ ruled that Ayyoub had not met his burden of demonstrating that his marriage to Coen was entered into in good faith, rejected his request for voluntary departure, and found him deportable under 8 U.S.C. § 1251(a)(1)(D)(i) as charged. Ayyoub appealed the IJ's decision to the BIA, which affirmed it on May 23, 2002. Ayyoub filed a timely petition for review of the BIA's order with this court on June 20, 2002. Ayyoub alleges that the BIA's finding that he did not prove his marriage was entered into in good faith is not supported by the record. He also asserts that he was improperly denied voluntary departure.

## II.

### A. Good Faith Marriage

An alien who challenges the factual basis of a determination by the BIA that he did not meet his burden of proving his marriage was entered into in good faith for the purposes of 8 U.S.C. § 1186a(c)(4)(B) is entitled to relief only if the determination is not supported by substantial evidence, *See El–Hadi v. INS*, No. 98–4282, 1999 WL 825042, at *4 (6th Cir. Oct.8, 1999); *Sinadinovski v. INS*, No. 95–3730, 1996 WL 435606, at *2 (6th Cir. Aug.1, 1996). All this standard requires "is that the BIA's conclusion, based on the evidence presented, be substantially reasonable," *Klawitter v. INS*, 970 F.2d 149, 151 (6th Cir.1992) (quoting *Diaz–Escobar v. INS*, 782 F.2d 1488, 1493 (9th Cir.1986)). A court may not reverse a factual finding of the BIA merely because it would have reached a different conclusion based upon its review of the record; rather, "in order to reverse the BIA's factual determinations, the reviewing court must find that the evidence not only supports a contrary conclusion, but indeed *compels* it." *Id.* at 152.

Ayyoub bore the burden of demonstrating by a preponderance of the evidence that his marriage to Coen was entered into in good faith in order to obtain a waiver of the requirement that he file a timely joint petition with Coen for removal of the conditions on his permanent resident status. *See* 8 U.S.C. § 1186a(c)(4). In determining whether an alien has met this burden, the BIA is entitled to consider "any credible evidence relevant to the application." *Id.* This evidence may include "(i) [d]ocumentation relating to the degree to which the financial assets and liabilities of the parties were combined; (ii)[d]ocumentation concerning the length of time during which the parties cohabited after the marriage and after the alien obtained permanent residence; ... and (iv)[o]ther evidence deemed pertinent." 8 C.F.R. § 216.5(e)(2). The BIA has "the sole discretion" to determine "what evidence is credible and the weight to be given that evidence." 8 U.S.C. § 1186a(c)(4). Ultimately, the BIA must look to "the amount of commitment by both parties to the marital relationship," 8 C.F.R. § 216.5(e)(2), and determine whether they "intended to 'establish a life together at the time they were married.'" *El–Hadi*, 1999 WL 825042, at *4 (quoting *Bark v. INS*, 511 F.2d 1200, 1201 (9th Cir.1975)). The actions of the parties after their marriage may be considered to the extent the actions illuminate the intent of the parties at the time they married. *Id.*

■ Ayyoub produced scant evidence that he and Coen shared financial assets.

He admitted that he maintained a separate checking account, and, though he provided evidence that his and Coen's names were attached to the same checking account, he could point to no evidence that Coen ever utilized that account. Ayyoub produced no documentation that he and Coen jointly owned any property. And the lone jointly filed tax return submitted by Ayyoub is only marginally probative of the degree to which he and Coen shared financial assets.

As for the extent to which Ayyoub and Coen lived together, Coen testified that she did not live with Ayyoub until six or seven months after their marriage. Ayyoub admitted that he and Coen lived together only sporadically and that Coen in fact lived with several other men on various occasions. Moreover, Ayyoub testified that he was frequently away on business for extended periods of time, which detracts from his assertion that he and Coen lived together for any substantial duration. Ayyoub's lengthy obliviousness to Coen's occupation and to her substance abuse only further supports the conclusion that he and Coen did not spend much meaningful time together immediately following their marriage, much less live together as husband and wife.

There is also other pertinent evidence supporting the conclusion that Ayyoub and Coen did not enter their marriage in good faith. Ayyoub confessed that he became engaged to another woman in Jordan the year after he married Coen. Although he subsequently divorced this second fiancee, the mere fact that he so quickly became engaged to this woman while he was still married to Coen belies any assertion that he was committed to Coen. The fact that Coen had several boyfriends during her marriage to Ayyoub supports the conclu-sion that she likewise was never committed to the marriage.

Beyond the fact that Ayyoub produced little evidence that he and Coen entered into marriage in good faith, there is affir-mative evidence that suggests the mar-riage was actually entered into for illicit purposes. Coen's own sworn statements indicate that she married Ayyoub for mon-ey. And Zubaidi's statement suggests Ayyoub married Coen not out of love but to obtain fraudulently permanent resident status.

All of this evidence, or lack thereof, amply supports the conclusion that Ayyoub failed to show that he and Coen were committed to their marital relationship when they married or that they intended to establish a life together at that time. We therefore affirm the BIA's determina-tion that Ayyoub did not meet his burden of proving he and Coen married in good faith.

Ayyoub offers several unavailing argu-ments against this conclusion.[6] First, Ayyoub claims that the BIA improperly relied on hearsay testimony, which he al-leges included Coen's 1995 affidavit that indicated she was paid to marry Ayyoub, Coen's testimony before the INS, Kin-caide's affidavit, and Zubaidi's affidavit. The Federal Rules of Evidence do not govern the admissibility of evidence in de-portation proceedings, and evidence is not inadmissible merely because it constitutes hearsay under those rules. *See Felzcerek v. INS*, 75 F.3d 112, 116 (2d Cir.1996); *see also Dallo v. INS*, 765 F.2d 581, 586 (6th Cir.1985) ("The Federal Rules of Evidence do not apply in immigration hearings."). In fact, 8 U.S.C. § 1186a(c)(4) explicitly provides that the BIA may consider "*any*

**6.** Ayyoub also argues that the IJ's decision contains certain mistakes of fact and that, in affirming the IJ's decision, the BIA adopted these mistakes of fact. On the contrary, the BIA's decision corrected those errors in the IJ's decision identified by Ayyoub.

credible evidence" relevant to an alien's application for a waiver. *Id.* (emphasis added). Nonetheless, the Fifth Amendment guarantees aliens due process in deportation proceedings, and "[t]he due process test for admissibility of evidence in a deportation hearing 'is whether the evidence is probative and whether its use is fundamentally fair.'" *Felzcerek,* 75 F.3d at 115 (quoting *Bustos–Torres v. INS,* 898 F.2d 1053, 1055 (5th Cir.1990)); *see also Myers v. Sec'y of Health & Human Servs.,* 893 F.2d 840, 846 (6th Cir.1990) ("Hearsay evidence is admissible in an administrative proceeding, provided it is relevant and material.").

Yet, when an alien does not object to the admissibility of evidence at the deportation proceeding, he has waived any objection to that evidence and the BIA may consider that evidence on appeal. *See Matter of Edwards,* 20 I & N Dec. 191, 199 n. 4 (BIA 1990) ("[B]ecause the respondent did not object to the entry of this document into evidence at the hearing below, it is not appropriate for him to object on appeal."); *see also Munoz–Marquez v. INS,* No. 92–70507, 1995 WL 29400, at *1 (9th Cir. Jan.24, 1995) (finding that alien could not later challenge evidence as hearsay when he did not object to its admissibility at his deportation hearing and also finding that the BIA properly relied on the evidence). Indeed, "[a] deportation proceeding is a purely civil action," *INS v. Lopez–Mendoza,* 468 U.S. 1032, 1038, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984), and it is well-settled in civil actions that "[a] party may not assert as error the introduction of evidence unless a timely objection is made." *Helminski v. Ayerst Labs.,* 766 F.2d 208, 211 (6th Cir.1985); *see also* Am.Jur.2d *Trial* § 412 ("If, when admissible evidence is offered, the party against whom such evidence is offered consents to its introduction, or fails to object ... such party waives any objection thereto, and the evidence is in the record for consideration the same as other evidence.").

■ On appeal before the BIA, Ayyoub challenged the IJ's reliance on the same statements challenged here on the ground that they constituted hearsay. The BIA found that Ayyoub, who was represented by counsel before the IJ, did not object to the admission of this evidence before the IJ, a finding Ayyoub does not contest on appeal. Hence, Ayyoub failed to object to the statements he alleges constitute hearsay at his deportation hearing, and he cannot now contest the consideration of such evidence. Even if we disregarded the statements Ayyoub contends are hearsay, we would still find, based upon Ayyoub's own testimony and the lack of supportive evidence submitted by him, that the BIA was correct in concluding that he has not met his burden of demonstrating that he married Coen in good faith.

■ Ayyoub next contends that the BIA should not have relied on Coen's admissions since she later retracted them and, instead, should have credited her assertions that she married Ayyoub for love. Considering that the BIA possessed "sole discretion" to determine "what evidence [was] credible and the weight to be given that evidence," 8 U.S.C. § 1186a(c)(4), it was perfectly within the BIA's discretion to credit or discredit Coen's testimony as it saw fit. Even if Coen's admissions are disregarded because of her subsequent retractions, the BIA's finding that Ayyoub did not prove he and Coen married in good faith is amply supported by his own admissions and lack of supportive evidence. Ayyoub also challenges the weight granted by the BIA to other evidence, an argument we need not address because, again, it is within the BIA's sole discretion to determine the weight to be given evidence. *Id.*

## B. Voluntary Departure

Ayyoub contends that, even if he did not meet his burden of proving that his marriage to Coen was entered in good faith, he should be granted voluntary departure because he has established that he is a person of good moral character. An alien is not eligible for voluntary departure unless he can show that he is and has been a person of good moral character for at least five years prior to his request for voluntary departure. 8 U.S.C. § 1254(e).[7] The BIA found that Ayyoub did not meet this burden. A finding that an alien is not entitled to voluntary departure based on his failure to demonstrate his good moral character is reviewed for substantial evidence. *Bernal v. INS*, 154 F.3d 1020, 1022 (9th Cir.1998). "The INS is granted wide discretion in evaluating the applicant's character." *Id.* Ayyoub admitted that he became engaged to another woman while married to Coen, and other evidence suggests that Ayyoub's marriage to Coen was fraudulent. Hence, the BIA's determination that Ayyoub could not establish that he is of good moral character is supported by substantial evidence.

### III.

For the foregoing reasons, we affirm the decision of the BIA.

**7.** IIRIRA replaced this provision with 8 U.S.C. § 1229c(b), which contains a modified standard for demonstrating eligibility for voluntary departure. *See* IIRIRA Pub.L. No. 104–208. §§ 304 & 308, 110 Stat. 3009, 3009–596,–615 (Sept. 30, 1996). However, the decision under review was made under 8 U.S.C. § 1254(e).