**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 07a0717n.06**
**Filed: October 4, 2007**

**No. 06-4068**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| ALICE ACHEAMPONG, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | ON PETITION FOR REVIEW |
| v. | ) | OF AN ORDER OF THE |
| | ) | BOARD OF IMMIGRATION |
| PETER D. KEISLER, | ) | APPEALS |
| Acting Attorney General | ) | |
| | ) | |
| Respondent-Appellee. | ) | |

Before:        BOGGS, Chief Judge; and MARTIN and SUTTON, Circuit Judges

BOGGS, Chief Judge. An Immigration Judge (IJ) decided that Alice Acheampong's marriage

was a sham, denied her petition for permanent resident status, and ordered her deported. The Board

of Immigration Appeals (BIA) affirmed, but allowed Acheampong to depart voluntarily.

Acheampong appeals and we affirm because the record does not compel a contrary conclusion.

I

Acheampong, a native and citizen of Ghana, used her sister-in-law's documents to enter the

United States on April 20, 1992. She filed for asylum with the agency then known as the INS in

1992. The application was referred to the Executive Office of Immigration Review in 1995, but no

decision was reached. According to Acheampong's testimony before the IJ, in 1995 Acheampong

was introduced to Hosea Evans, a United States citizen, by her sister-in-law. After four dates, Evans

proposed and the pair married in Toledo on March 29, 1996. On October 9, 1996, Acheampong adjusted her status to "conditional permanent resident" based on the marriage. The couple filed a joint petition to remove the condition on her residency on July 15, 1998, slightly more than two years after the marriage as required by the statutory scheme. In 1999, Officer Daniel Wells of the INS reviewed Acheampong's petition, interviewed the couple, and became suspicious because the couple "knew very little about one another" and "did not reside together." He submitted the case for further action, but for reasons not in the record the case was returned to him in 2001 without any further action having been taken.

Wells re-interviewed the couple in November of 2001. This time the interview was videotaped, and the couple brought counsel. Before the interview, Wells learned that both Acheampong and Evans filed their taxes as "Head of Household" from separate addresses and that their joint bank account showed minimal activity. At the interview, Acheampong and Evans told different stories on multiple subjects, including whether they knew certain members of each other's family and when and where they lived together. Acheampong could not give the names or ages of Evans's children from his previous marriage or give any information about his hospitalization following a recent stroke. Despite being a Registered Nurse, she misidentified which side of his body the stroke harmed and could not identify any of the medicines he was taking.

On April 10, 2002, the INS denied Acheampong's petition and on April 11 issued her a Notice to Appear in removal proceedings. Acheampong appeared before an IJ on April 4, 2003 and

denied removability, challenged the termination of her status as a permanent resident, and renewed her asylum claims.[1]  A full hearing was held on February 9, 2005.

At the hearing, Acheampong admitted that she has not listed Evans as a beneficiary on her health insurance or her retirement plan.  She could not say where he attends church.  When confronted with the separate tax returns, she blamed the preparers.  She claimed that the couple began living together after their marriage, lived apart from July 2001 to late 2004 because of personal problems, financial problems, and Evans's stroke, but then began living together again when they purchased a home in November 2004.  When shown loan documents listing both Acheampong and Evans as single people residing at separate addresses, Acheampong once again claimed ignorance and blamed the preparers.

Evans testified that he suffered a stroke in 2000 that prevented him from working and created memory problems.  He said that the couple lived together "on and off."  When asked to clarify that statement, he replied "[w]ell, she worked and I worked and we lived together because, on and off because it seemed like it was better that way."  Later, when asked where he lived immediately after he married Acheampong, he answered "with my daughter (from a previous marriage)."  As to the taxes and the loan applications, he also blamed the preparers.  His testimony repeatedly conflicted with Acheampong's, but the BIA discounted those inconsistencies because of Evans's poor health.

---

[1] Acheampong also filed a claim under the Convention Against Torture.  She based the asylum and the torture claim on three arrests  She ultimately acknowledged that the political situation in Ghana had changed, admitted that she had returned to Ghana at least twice since she left, and withdrew her asylum claims at the February 9, 2005, hearing before the IJ.

The only other witnesses were Officer Wells and Acheampong's brother, who testified that he was present at the couple's wedding ceremony. Acheampong submitted evidence that the couple owned a joint bank account, but it showed minimal activity. Acheampong also submitted "Letters of Support" from six people who claimed to know the couple well, but four of these letters contained only identical two-sentence statements. The others came from Acheampong's brother and sister-in-law.

On February 10, 2005, the IJ ruled that Acheampong's marriage was a sham. He discussed the lack of documentary evidence and stated that he still could not determine whether Acheampong and Evans had lived together before 2004. He stressed that it was not the fact that they lived apart that was troubling, but the "inability of the respondent and her own witnesses, the petitioning spouse and the brother, to agree on when they lived together" that made him skeptical.

When Acheampong appealed to the BIA, the BIA acknowledged certain "irregularities" in the 2001 interview[2] and also noted Evans's medical condition at the 2005 hearing. Therefore, the BIA placed only limited weight on the inconsistencies at the 2001 interview and Evans's testimony at the 2005 hearing. Nevertheless, the BIA pointed to seven other facts that supported the IJ's decision and affirmed. This appeal followed.

---

[2] The irregularities were that Wells misled the couple at the 2001 interview about whether a prior investigation had been conducted on their marriage and that Wells told a trainee that he thought Acheampong was Nigerian and that Wells had prior experience with Nigerians and credit card fraud. Wells defended his statement about credit card fraud as giving the trainee more information for future cases and said it played no role in his decision about Acheampong. While we do not condone Wells's conduct, we see no way that it prejudiced the hearing before an independent IJ, especially given the BIA's minimal reliance on Wells's interview.

II

At trial, the government must prove that an alien's marriage is fraudulent and that the alien is therefore removable.[3] 8 U.S.C. § 1186a(c)(3)(D). However, on appeal we ask only if the BIA's decision, under the proper standard, was supported by substantial evidence. *Klatwitter v. INS*, 970 F.2d 149, 151 (6th Cir. 1992). Under this standard, "[a] factual determination by the Board that an alien's marriage was entered for the purpose of gaining entry into the United States is conclusive if it is supported by reasonable, substantial, and probative evidence in the record considered as a whole." *Bazzi v. Ashcroft*, 118 F. App'x 953, 956 (6th Cir. 2004). This is a deferential standard; we cannot reverse merely because we would have decided the case differently. Indeed, the Supreme Court has told us that "[t]o reverse [a] BIA finding we must find that the evidence not only *supports* that conclusion, but *compels* it." *INS v. Elias-Zacharias*, 502 U.S. 478, 481 n.1 (1992) (emphasis in original). The deferential standard dictates our decision to affirm.

III

An alien who marries a United States citizen can apply for lawful permanent resident status. For the first two years, the alien is given only conditional permanent residence. *See* 8 U.S.C. §§ 1186a(a)(1), (g)(1). After two years, the alien and his or her spouse must file a petition to remove the condition. This is what Acheampong did. In normal cases, the government will grant permanent

---

[3]Acheampong's brief alleges that the BIA wrongly altered this burden of proof by pointing out her "failure to produce witnesses, other than her brother, who knew the couple when they first married," among six other persuasive facts that support the IJ's decision. However, listing a lack of witnesses *among other persuasive facts* does not amount to requiring Acheampong to produce witnesses in order to prevail or switching the burden of proof, and we reject her attempt to characterize it as such.

resident status, but if the Attorney General finds that "the qualifying marriage . . . was entered into for the purposes of procuring the alien's admission as an immigrant" the Attorney General may notify the parties, terminate the alien's conditional permanent resident status, and begin removal proceedings. 8 U.S.C. § 1186a(b)(1)(A). A marriage formed to help one spouse circumvent immigration law and not as the couple's good faith attempt to start a life together is called a "fraudulent or sham marriage, and has not been recognized as enabling an alien spouse to obtain immigration benefits." *Matter of McKee*, 17 I. & N. Dec. 332, 333 (BIA 1980).

Federal regulations explain that whether a marriage was formed in good faith depends on "'the amount of commitment by both parties to the relationship.'" *El-Hadi v. INS*, No. 98-4282, 1999 WL 825042, at *4 (6th Cir. Oct. 8, 1999) (quoting 8 C.F.R. § 216.5(e)(2)). Evidence of commitment includes "documentation relating to the degree to which assets and liabilities were combined, the length of time the parties cohabited, birth certificates for children born to the marriage, and '[o]ther evidence deemed pertinent by the director.'" *Ibid.* Additional relevant evidence includes "proof that the petitioner's spouse has been listed on insurance policies, property leases, income tax forms, or bank accounts, and testimony or other evidence regarding courtship, wedding ceremony, shared residence, and experiences." *Matter of Soriano*, 19 I. & N. 764, 766 (BIA 1988). The seminal case explained that courts must consider the evidence and ask whether the parties "intend[ed] to establish a life together at the time they were married." *Bark v. INS*, 511 F.2d 1200, 1201 (9th Cir. 1975). Conduct after the marriage is evidence of the couple's state of mind at the time they married. *Id.* at 1202. Our court has quoted both the BIA opinions and *Bark* with approval. *See Ayyoub v. INS*, 93

F. App'x 828, 832 (6th Cir. 2004) (quoting *Bark*); *El-Hadi*, 1999 WL 825042, at *4 (quoting *Bark*

and *McKee*).

Applying the standard of review and the governing law, we ask whether substantial evidence

supports the BIA's conclusion that Acheampong and Evans did not intend to establish a life together

when they married. *See Klatwitter*, 970 F.2d at 151; *Bark*, 511 F.2d at 1201. The BIA found the

following facts persuasive: (1) The parties' repeated decision to file separate tax returns each

claiming "Head of Household" status and each using a different address from the other; (2)

Acheampong's failure to list Evans as a beneficiary on her life insurance or pension; (3) the loan

application listing both Acheampong and Evans as single adults; (4) Acheampong's failure to

produce witnesses other than her brother who knew the couple when they first married; (5) lack of

evidence of shared finances; (6) Acheampong's ignorance of Evans's religion, income, or

medication; and (7) lack of consistent evidence that the couple shared a home before removal

proceedings began. We review the record and find all these conclusions factually supported by the

evidence and legally relevant based on our cases.

For the first eight years of their marriage, Acheampong and Evans filed separate tax returns

claiming "Head of Household" status and giving separate addresses. Failure to file a joint tax return

is evidence that the marriage is a sham. *Sinadinovski v. INS*, No. 95-3730, 1996 WL 435606, at *1

(6th Cir. Aug. 1, 1996). Acheampong blames the tax preparers. Tax preparers may make mistakes,

but they also rely on the information they are given. Eight consecutive years of filing as separate

"Heads of Household" from separate addresses suggests separate lives.

Acheampong admitted that she did not list Evans as a beneficiary on her life insurance or pension. Listing or failing to list a spouse on such policies is relevant evidence. *Sinadinovski*, 1996 WL 435606, at \*3; *Matter of Soriano*, 19 I. & N. 764, 766 (BIA 1988). Acheampong offers alternative explanations for these inconvenient facts, but the mere existence of a plausible alternative explanation does not disprove the government's assertion or the BIA's findings. An ambiguous fact consistent with both Acheampong's position and the BIA's finding does not *compel* us to agree with Acheampong and thus reverse the BIA. *See Elias-Zacharias*, 502 U.S. at 481 n.1.

Identical analysis applies to the loan application listing Acheampong and Evans as single adults living at separate addresses. Acheampong once again blames the third-party preparer, but we repeat that the preparer can only use information she is given. More importantly, the application is consistent with two people who do not hold themselves out as married unless the immigration authorities are watching.

Acheampong's failure to produce witnesses, other than her brother, who knew the couple at the time of marriage is telling given that the focus is on the parties' intent at the time of the marriage. As mentioned earlier, the record includes several "Letters of Support" by people claiming to know the couple, but a majority of the letters come from people who did not know the couple before 2000 and consist solely of the same two sentences. None of the authors appeared at the hearing to face cross-examination. Our court has relied on a lack of witnesses to a couple's relationship to affirm the BIA. *See El-Hadi*, 1999 WL 825042, at \*4.

Substantial evidence supports the BIA's conclusion that the couple did not share financial resources. Acheampong presented records of a shared bank account. However, an account listing two names without evidence that both parties actually *used* the account is not evidence of shared finances. *Ayyoub*, 93 F. App'x at 832-33. Acheampong's first account, with Michigan National Bank, shows minimal activity. The second account, with Comerica, shows slightly more activity, with a small deposit every one to two months. But the second account is less persuasive because it was established only after removal proceedings began. Nowhere is there evidence of a joint account that was consistently used by both parties. Acheampong relies on photocopies of three checks she wrote to Evans for groceries as evidence of shared finances. But three checks, for a total of $130, is not the kind of evidentiary record that "compels" us to disagree with the BIA.

Acheampong could not give the court information about Evans's job, religion, or even the medication he takes. Neither this court nor the BIA expects spouses to know everything about each other, but it is telling when a nurse cannot be sure what medication her husband takes for his stroke.

Finally, there is the question of living arrangements. At both the 2001 interview and at the 2005 hearing, the couple gave conflicting stories about when they lived together. While they were living together from November 2004 onwards (after removal proceedings began), there is no documentary evidence that they lived together before that time. The parties admit they often lived apart between 2001 and 2004. As the IJ pointed out, even Acheampong and her own witnesses could not agree when the couple lived together before July of 2001. The best the couple could say is that they lived together "on and off."

Merely living apart does not make the marriage a sham, but "we have on several occasions viewed evidence of an alien's living separately from his or her spouse as support for the conclusion that the marriage is not bona fide." *Ly v. Gonzalez*, 185 F. App'x 451, 454-55 (6th Cir. 2006) (citing *Bangura v. Hansen*, 434 F.3d 487, 503 (6th Cir. 2006) and *United States v. Kone*, 307 F.3d 430, 434 (6th Cir. 2002)). Sporadically living together is also evidence that a marriage is not bona fide. *Ayyoub*, 93 F. App'x 828, 833 (6th Cir. 2004).

Acheampong contends that *Bark* and *McKee* preclude the BIA from finding that her marriage was a sham simply because she did not live with her husband. Her contention is correct but irrelevant. The BIA did not reach its decision based on living arrangements alone, but on all of the evidence previously mentioned. *Bark* itself says that evidence of separation "is relevant in ascertaining whether they intended to establish a life together when they exchanged marriage vows." *Bark*, 511 F. 3d at 1202; *see also McKee*, 17 I. & N. at 334 ("although separation in and of itself is no longer a valid basis for denial, . . . it is a relevant factor in determining the parties' intent at the time of the marriage, i.e., whether the marriage is a sham."). The BIA correctly treated separation as relevant but not dispositive evidence.

Acheampong also cites *McKee*, arguing that the BIA may not deny her petition because it finds that her marriage is "not viable." *McKee*, 17 I. & N. at 333. But that is not what the BIA did. Viability deals with the ongoing status of a marriage and current relationship between the parties. Fraud looks to the intent of the parties when the marriage was formed. *See ibid.* Viability is irrelevant because the BIA found her marriage fraudulent.

Finally, we note that this court has repeatedly affirmed BIA decisions finding a sham marriage on records similar to the one before us now. In *El-Hadi* we affirmed the BIA where there was no credible evidence of joint ownership of property, commingling of finances, or documentation that the parties entered the marriage in good faith. *El-Hadi*, 1999 Wl 825042, at *4. In *Ayyoub* we affirmed the BIA's finding where the parties often lived apart, the joint checking account showed no evidence of joint use, there was no joint property, and the parties knew little of each other. *Ayyoub*, 93 F. App'x at 833. The Seventh Circuit affirmed an IJ's finding that a marriage was not bona fide when, as with Acheampong, the couple told different stories about the marriage, had a short period of cohabitation, misrepresented their addresses, and could not show that they shared any assets or liabilities. *Nikrodhanondha v. Reno*, 202 F.3d 922, 925 (7th Cir. 2000). Most recently, we affirmed the BIA when the spouses gave different addresses on an immigration form and one spouse missed an immigration hearing. *See Ly*, 185 F. App'x at 451.

Most of the facts in these cases are also present in Acheampong's case. As in *Ayyoub*, here the parties often lived apart, cannot provide basic information about each other, and the joint bank account shows no evidence of joint use. As in *El-Hadi*, here we see a lack of commingled finances and documentation. *Nikrodhanondha* is most on point because there, as here, the parties told different stories about the marriage, cohabited sporadically, gave different addresses, and could not show shared finances. Indeed, Acheampong presents an even stronger case for affirming the BIA, given the loan form listing the parties as single with separate addresses and the eight years of tax returns

where Acheampong and Evans filed as separate "Heads of Household" from separate addresses.  The

BIA had substantial evidence for its conclusion.

We therefore AFFIRM the Board's decision.