RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0154p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

MIRVAT A.M.I. ELGEBALY,

                                       *Petitioner*,

    *v.*

MERRICK B. GARLAND, Attorney General,

                                       *Respondent*.

Nos. 23-3354/3877

─────────────

On Petition for Review from the Board of Immigration Appeals.
No. A 059 525 513.

Decided and Filed:  July 23, 2024

Before:  BOGGS, CLAY, and GIBBONS, Circuit Judges.

─────────────

## COUNSEL

**ON BRIEF:**  Russell Reid Abrutyn, ABRUTYN LAW PLLC, Southfield, Michigan, for Petitioner.  Margot P. Kniffin, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

─────────────

## OPINION

─────────────

CLAY, Circuit Judge.  Petitioner Mirvat Elgebaly, a native and citizen of Egypt, seeks review of two Board of Immigration Appeals ("BIA") decisions in this consolidated appeal.  The first decision affirmed an immigration judge's ("IJ") denial of Elgebaly's two applications for a hardship waiver of the requirement that a noncitizen spouse submit a joint petition with her citizen spouse to remove conditions on her permanent resident status.  8 U.S.C. § 1186a(c)(4).  On appeal, Elgebaly claims that the BIA and IJ erred in finding her ex-husband's testimony

credible, that the substantial evidence did not support denial of the hardship waivers, and that the IJ erred in failing to assist Elgebaly, proceeding *pro se*, in developing the record. The second BIA decision denied Elgebaly's motion to reopen proceedings. *Id.* § 1229a(c)(7). Elgebaly argues that the BIA abused its discretion in considering her purportedly new and material evidence submitted with this motion. For the reasons set forth below, we **DENY** Elgebaly's petitions for review.

## I. BACKGROUND

Elgebaly was lawfully admitted to the United States as a conditional permanent resident on July 12, 2007 after she married American citizen Saladin Muhammad. Noncitizens who marry a United States citizen may receive conditional permanent resident status. *Id.* § 1186a(a)(1). The noncitizen spouse can apply for removal of the conditions of his or her status by submitting a petition jointly with the citizen spouse requesting the removal of these conditions. *Id.* § 1186a(c)(1)(A). If the citizen spouse does not submit the petition alongside the noncitizen spouse, the noncitizen spouse can apply for a hardship waiver, which the Secretary of Homeland Security, acting through immigration authorities, may grant if certain statutory criteria are met. *Id.* § 1186a(c)(4); *see also Al-Saka v. Sessions*, 904 F.3d 427, 430 (6th Cir. 2018).

On March 30, 2009, Elgebaly and Muhammad submitted a joint petition to remove the conditions on Elgebaly's permanent resident status. But almost a year later, Muhammad withdrew the joint petition. Immigration authorities accordingly terminated Elgebaly's conditional permanent resident status and served her with a notice to appear for removal proceedings. On October 12, 2011, Elgebaly appeared before an IJ for an initial hearing. The IJ continued the hearing to give Elgebaly time to find an attorney.

During this continuance, Elgebaly applied for two hardship waivers to the joint petition requirement. First, she filed a waiver under a provision requiring her to show that she entered her marriage "in good faith," but her spouse later "battered" her or subjected her to "extreme cruelty." 8 U.S.C. § 1186a(c)(4)(C). Then, after she divorced Muhammad, she filed a separate hardship waiver under a provision that also requires a showing that she entered the marriage "in good faith," and that the marriage has been terminated. *Id.* § 1186a(c)(4)(B). Immigration

authorities denied both waivers because they found that she did not marry Muhammad in good faith or suffer extreme cruelty.

## 1. Hearings Before Immigration Judge

Elgebaly appeared before an IJ again on March 23, 2017. She admitted to the facts that made her removable from the United States, but requested that the immigration judge review *de novo* the denial of her hardship waivers. *See* 8 C.F.R. § 1216.5(f) (permitting a noncitizen to seek review of a hardship waiver denial in removal proceedings). Accordingly, the testimony at Elgebaly's removal proceeding centered on whether she married Muhammad in good faith and whether she experienced extreme cruelty during the marriage.

The IJ conducted multiple hearings, eliciting testimony from Elgebaly, her adult son by a previous marriage, her sister, her brother-in-law, her nephew, and Muhammad. Because Elgebaly was proceeding *pro se*, the IJ, as well as the government, asked questions of the witnesses; however, the IJ offered Elgebaly and her son—who spoke English fluently and was, at this time, a party to the removal proceedings—an opportunity to ask questions as well.

Witnesses offered largely consistent testimony detailing how Muhammad and Elgebaly came to be married. In approximately 2004 to 2005, Muhammad was a patient and then employee of the medical practice of Elgebaly's brother-in-law, Abdulbaset Youssef. One day, Muhammad asked Tag Elgebaly ("Tag"), Elgebaly's sister who worked at the practice, if she knew any single, Muslim women. Tag suggested her sister, Elgebaly, who lived in Egypt at the time. Elgebaly and her family members claimed that Elgebaly and Muhammad talked over the phone and via email after Muhammad's conversation with Tag. Despite these claims, no emails between Elgebaly and Muhammad were introduced into the record, purportedly because Elgebaly could not remember her email password. Muhammad testified that he never spoke to Elgebaly before meeting her in person and had only seen one photo of her.

Eventually, Muhammad traveled to Egypt to meet Elgebaly. A few days into this roughly ten day trip in January 2006, Muhammad and Elgebaly were married. Muhammad did not anticipate that he would marry Elgebaly on the trip, but said that he did so because he trusted Tag, who accompanied Muhammad to Egypt. Although Youssef testified that neither he nor Tag

paid for Muhammad's flights to Egypt, this testimony was contradicted by both Youssef's prior sworn statement and Muhammad's testimony. Elgebaly and her son remained in Egypt for about a year and a half while their visas for entry into the United States were processed. Both Elgebaly and Muhammad testified that they spoke on the phone during this period, but Muhammad never returned to Egypt to visit Elgebaly.

Elgebaly and her son entered the United States in July 2007 as conditional permanent residents. The witnesses' testimonies describing Elgebaly's time in the United States and her subsequent married life with Muhammad differed significantly. Elgebaly and her family members testified that she lived in Muhammad's apartment for about a year after she came to the United States. Elgebaly also testified that she and Muhammad were physically intimate during this period. Muhammad contradicted this. He testified that, despite his requests, Elgebaly never moved into his apartment, but instead stayed with relatives. He also testified that the couple spent very little time together when married, were not intimate, and never consummated the marriage. Other than a driver's license listing Muhammad's apartment as her home address, Elgebaly submitted no corroborating documents to support her claim that she lived with Muhammad while in the United States.

After about a year, Elgebaly returned to Egypt for a few months to resolve personal issues. While Elgebaly was in Egypt, Muhammad moved out of his apartment and moved in with relatives. When Elgebaly came back to the United States, she moved in with Tag and Youssef, and then with her son when he moved to a new apartment. A few months later, in March 2009, Elgebaly and Muhammad submitted a joint petition to remove the conditions from her permanent resident status. After Muhammad withdrew the joint petition on March 24, 2010, Elgebaly filed for divorce, and on March 8, 2013, Elgebaly and Muhammad were divorced. At no point during the marriage did they have a joint bank account. Muhammad testified before the IJ that he believed Elgebaly had married him to become an American citizen.

The IJ sustained the denial of Elgebaly's hardship waivers and ordered that she be removed to Egypt. It found Elgebaly's and her family's testimony not credible because their testimony contradicted both Muhammad's testimony and Youssef's own prior sworn statements, and because Elgebaly offered insufficient corroboration of her story. Based on Muhammad's

credible testimony, the IJ concluded that Elgebaly had not married Muhammad in good faith, rendering her ineligible for either hardship waiver. Specifically, Muhammad testified that he and Elgebaly never lived together as a married couple, were not intimate, and never shared a joint bank account. Further, Elgebaly left the United States for Egypt for a months-long trip just one year into her marriage with Muhammad, and, when she returned, did not need to retrieve any belongings from Muhammad, indicating that she did not reside with him while in the United States. Finally, the IJ noted that Elgebaly kept her passport at Youssef and Tag's home, indicating that she lived there, rather than with Muhammad. The IJ also rejected Elgebaly's claim that Muhammad's decision to withdraw the joint petition waiver subjected her to extreme cruelty, noting that she had not proffered any supporting documentation or professional evaluation to support this charge.

### 2. Board of Immigration Appeals

Elgebaly appealed to the BIA, which dismissed the appeal. The BIA adopted and affirmed the IJ's decision, finding that the IJ committed no clear error in his credibility assessment or conclusion that Elgebaly had not shown that she entered the marriage in good faith. Additionally, despite Elgebaly's arguments, the BIA found that the IJ conducted the hearing in a fair manner without any hint of judicial bias.

Elgebaly then retained counsel and filed a timely motion to reopen proceedings with the BIA. *See* 8 U.S.C. § 1229a(c)(7). She claimed that because she proceeded *pro se* during the earlier proceedings, she had not been able to present all of the available evidence supporting her request for a hardship waiver. In support of her motion, she attached: (1) a statement detailing the testimony she would have given at the proceeding had she been represented by counsel; (2) photographs of her and Muhammad and text messages between the couple; and (3) documents explaining Egyptian religious and cultural practices in an attempt to show that her marriage with Muhammad was consistent with these practices. In her statement, she claimed that the family of her former husband—who she had married in Egypt and since became deceased—had been hostile to her after she brought her son to the United States and permitted him to marry a Shia, rather than Sunni, Muslim woman. She claimed that this hostility made her afraid to return to Egypt.

The BIA denied her motion to reopen. It found that her removal proceedings were not fundamentally unfair in a manner that would have prevented her from presenting much of the evidence attached to her motion to reopen, despite her *pro se* status. It further determined that she had failed to present any new, material evidence that would warrant reopening the case. Elgebaly filed a second petition for review of the BIA's denial of her motion to reopen.

## II.  DISCUSSION

### A.  Denial of Hardship Waivers

#### 1.  Jurisdiction

A hardship waiver to the joint petition requirement is comprised of two steps. First, the Secretary of Homeland Security, acting through immigration officials, must assess whether a petitioner is eligible for a hardship waiver—that is, whether she meets any of the statutory criteria for a hardship waiver. 8 U.S.C. § 1186a(c)(4); *see also Johns v. Holder*, 678 F.3d 404, 406 (6th Cir. 2012); *cf. Wilkinson v. Garland*, 601 U.S. 209, 212–13 (2024). Second, if a petitioner is eligible for a hardship waiver, the Secretary decides whether to exercise his discretion to grant the waiver. 8 U.S.C. § 1186a(c)(4); *see also Johns*, 678 F.3d at 406.

Our review of the denial of hardship waivers is constrained. We do not have jurisdiction to review the second-step discretionary decision to deny the hardship waiver. *See* 8 U.S.C. § 1252(a)(2)(B)(ii); *see also Johns*, 678 F.3d at 406; *cf. Wilkinson*, 601 U.S. at 225 n.4. And we may only review the first-step determination that a petitioner is eligible for a hardship waiver to the extent that the petitioner presents "questions of law." 8 U.S.C. § 1252(a)(2)(D). In particular, we may not review the factual determinations of "what evidence is credible and the weight to be given that evidence." *Id.* § 1186a(c)(4).

#### 2.  Standard of Review

Because the BIA adopted the IJ's decision and added additional commentary, "we directly review the decision of the IJ while also considering the additional comments made by the [BIA]." *Yeremin v. Holder*, 738 F.3d 708, 714 (6th Cir. 2013) (alteration in original) (citation omitted). "We review factual findings under the highly deferential substantial-evidence

test, meaning those findings stand unless any reasonable adjudicator would be compelled to disagree." *Marqus v. Barr*, 968 F.3d 583, 588 (6th Cir. 2020) (citations and internal quotation marks omitted). We review legal conclusions *de novo*. *Id.* at 589.

### 3. Analysis

Elgebaly brings multiple challenges to her immigration proceedings. She first claims that the IJ's credibility determination was so cursory that it does not permit meaningful judicial review. She further argues that the substantial evidence does not support the IJ's and BIA's (collectively, the "agency") findings that she did not marry in good faith and that she did not experience extreme cruelty in her marriage. Finally, she claims that the IJ did not sufficiently aid her in developing the record in the immigration proceedings while she proceeded *pro se*.

### a. Credibility Determination

Elgebaly first claims that the agency's credibility assessments were so cursory that they failed to provide a record upon which we could conduct meaningful judicial review. The BIA did not offer any additional substantive analysis of the credibility of witnesses, so we review only the IJ's decision. *See Yeremin*, 738 F.3d at 714. Because Elgebaly brings a procedural challenge to the sufficiency of the IJ's findings below, she presents a legal question that we have jurisdiction to review. *See Vasquez-Rivera v. Garland*, 96 F.4th 903, 908–09 (6th Cir. 2024).

Although we have jurisdiction to review this argument, it is unlikely that we could find a legal error in a cursory credibility determination in a hardship waiver denial. Generally, when we consider whether an IJ or the BIA failed to make sufficient findings to permit meaningful judicial review, it is because we have some review to conduct. *See, e.g.*, *Vasquez-Rivera*, 96 F.4th at 909 ("So long as . . . we can engage in 'meaningful judicial review under our usual substantial-evidence test,' there is no basis to conclude that the BIA committed a legal error." (quoting *Palucho v. Garland*, 49 F.4th 532, 539–40 (6th Cir. 2022)). But when reviewing a denial of a hardship waiver, we may not review the "determination of what evidence is credible." 8 U.S.C. §§ 1186a(c)(4), 1252(a)(2)(B)(ii). Thus, it is not clear what, if any, legal error could be committed by an allegedly cursory credibility determination in a hardship waiver analysis when we could not review even an extensive, well-supported credibility determination.

Even if this argument would theoretically make a difference in a petitioner's challenge to a hardship waiver denial, the IJ's credibility determination in this case was not so cursory as to prohibit meaningful judicial review. Records from an immigration proceeding permit sufficient judicial review when the agency "consider[s] the issues raised[] and announce[s] its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Scorteanu v. I.N.S.*, 339 F.3d 407, 412 (6th Cir. 2003) (citation omitted).

In this case, the IJ met these reasonable requirements. The IJ found that the testimony of Elgebaly and her witnesses fundamentally contradicted that of Muhammad, her former spouse. Specifically, the IJ highlighted that Muhammad's testimony that he never lived with or was intimate with Elgebaly contradicted Elgebaly's testimony about these issues. Further, the IJ noted that Elgebaly's brother-in-law, Youssef, testified that he did not pay for Muhammad's initial trip to Egypt to meet Elgebaly, whereas Muhammad testified that Youssef did pay for the trip. Contrary to Elgebaly's suggestion, the IJ did not merely acknowledge the inconsistencies in testimony and choose to believe Muhammad over Elgebaly and her witnesses. Instead, the IJ explained that Elgebaly had provided no documentation supporting her testimony that she moved in with Muhammad, and that Youssef had admitted in a previous sworn statement that he had, in fact, paid for Muhammad's trip to Egypt. The IJ thus emphasized the inconsistencies in the testimony of witnesses and explained the basis for believing Muhammad's version of the story. This explanation provides us with a sufficient record for meaningful judicial review.

Elgebaly claims that the IJ erred by failing to explicitly consider other factors that supported finding her and her witnesses credible. For example, she criticizes the IJ for failing to consider that Elgebaly's testimony was consistent with other witnesses and supported by evidence, and that the over ten year gap between the marriage and the immigration court proceedings may have caused certain explainable memory lapses. But the IJ's failure to explicitly discuss these additional factors in its analysis does not constitute legal error because we do not require the agency to "discuss each piece of evidence individually" to be satisfied that a full record is available for review. *Saleh v. Barr*, 795 F. App'x 410, 419 (6th Cir. 2019). Moreover, the immigration statute emphasizes that the credibility determination is a "totality of the circumstances" inquiry in which an IJ is not limited to assessing any specific set of factors.

8 U.S.C. § 1229a(c)(4)(C).  Thus, the IJ did not apply an incorrect legal standard, and did not otherwise legally err in its credibility analysis.  Instead, Elgebaly's arguments, although cast as a legal challenge to the sufficiency of the IJ's findings, boil down to factual disagreements with the IJ's credibility analysis.  And we are without jurisdiction to consider whether the IJ substantively erred in the credibility determination.  8 U.S.C. §§ 1186a(c)(4), 1252(a)(2)(B)(ii).

### b.  Substantial Evidence

Elgebaly next claims that the denial of her hardship waivers was not supported by substantial evidence.  We may review generally whether substantial evidence supports a finding that a petitioner is ineligible for a hardship waiver; however, because the statute constrains our review, we "must accept the [BIA's] decisions about the weight and credibility of the evidence in doing so."  *Johns*, 678 F.3d at 407.  Because the agency premised its denial of Elgebaly's hardship waivers on her lack of credibility and on Muhammad's credible testimony, she faces a demanding standard to overturn the denial based on a lack of substantial evidence.  *See id.* ("[O]ur constraint in second guessing weight and credibility decisions will make it very difficult, if not impossible, to overrule a hardship-waiver decision premised on lack of credibility.").  Accepting the agency's credibility determination and weighing of the evidence, we may not overturn the agency's decision unless we conclude that "any reasonable adjudicator would be compelled to conclude to the contrary."  8 U.S.C. § 1252(b)(4)(B); *see also Bi Qing Zheng v. Lynch*, 819 F.3d 287, 294 (6th Cir. 2016).

To establish her eligibility for both hardship waivers, Elgebaly must have shown that she entered her marriage in good faith.  8 U.S.C. § 1186a(c)(4)(B)–(C).  Ultimately, the agency needed to determine whether Elgebaly and Muhammad "intended to establish a life together at the time they were married."  *Ayyoub v. I.N.S.*, 93 F. App'x 828, 832 (6th Cir. 2004) (citations and internal quotation marks omitted).  To the extent it informs the intent of the couple at the initiation of the marriage, the agency can consider actions taken during or after the marriage as well.  *Id.*

As an initial matter, although Elgebaly casts her arguments as traditional substantial evidence arguments, she really challenges the weight given by the agency to certain pieces of

evidence. For example, she claims that the agency failed to sufficiently consider how her cultural and religious practices shaped her marriage, as well as photographs, text messages, and other documents that purportedly corroborated Elgebaly and her witnesses' version of events. These disputes with how the agency weighed the evidence ignore the jurisdictional limits on our review of a denial of a hardship waiver.

Accepting the agency's assessment of the credibility of witnesses and weight of the evidence as we must, substantial evidence supported the agency's finding that Elgebaly did not enter her marriage in good faith. Muhammad testified that he believed Elgebaly married him to become a United States citizen. Based on specific facts elicited at the hearing, the IJ found this statement credible. Primarily, the IJ recounted Muhammad's testimony that Elgebaly never lived with him during their marriage and that the couple was never intimate. Other than Elgebaly's driver's license listing Muhammad's home address as her address, Elgebaly submitted no corroborating documents to support her testimony that she lived with Muhammad during the marriage. Further, it appeared that Elgebaly did not keep her belongings at Muhammad's home, as she was able to seamlessly move in with relatives after her return from Egypt. Elgebaly also left the country for six months only a year into her marriage with Muhammad. Finally, the IJ acknowledged that Elgebaly had previously told immigration authorities that she never comingled her assets or shared a joint bank account with Muhammad. All of these facts support the agency's finding that Elgebaly did not marry Muhammad in good faith. *See Al-Saka*, 904 F.3d at 431; *Johns*, 678 F.3d at 407–08. Given that no other evidence compels an alternate conclusion, we may not overturn the agency's finding. Elgebaly therefore cannot succeed on her challenge to the denial of either of her hardship waivers.

Although we need not reach the issue, substantial evidence also supported the agency's finding that Elgebaly did not experience extreme cruelty during her marriage, a requirement for eligibility under the first hardship waiver that she submitted. 8 U.S.C. § 1186a(c)(4)(C). Elgebaly did not claim that she suffered physical abuse but argued that Muhammad's withdrawal of the joint petition constituted extreme cruelty. Substantial evidence supported the finding that this did not constitute extreme cruelty. Indeed, other than Elgebaly's own testimony, she offered no other evidence, such as documents or professional evaluations, that detailed how

Muhammad's decision constituted the type of "mental injury" or "[p]sychological . . . abuse" contemplated by the statute and its regulations. *See* 8 C.F.R. § 1216.5(e)(3)(i); *see also id.* § 1216.5(e)(3)(iv) ("[A]ll waiver applications based upon claims of extreme mental cruelty must be supported by the evaluation of a professional recognized by the [agency] as an expert in the field."). Elgebaly's arguments against the IJ's finding that she did not suffer extreme cruelty again amount to impermissible challenges to the agency's weighing of the evidence, and do not compel a different finding.

### c. Failure to Develop the Record

Elgebaly further argues that the IJ failed to assist her in developing the record while she proceeded *pro se*. "[T]o provide a fundamentally fair proceeding" under the Fifth Amendment's Due Process Clause, "immigration judges are bound by the recognized duty to help pro se parties develop the record." *Mendoza-Garcia v. Barr*, 918 F.3d 498, 505 (6th Cir. 2019). This means that IJs "must scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts," and "must be especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Id.* at 504 (citation omitted). In this case, the IJ adequately discharged this task. He took the lead in eliciting testimony from all witnesses and offered Elgebaly and her adult son (who is fluent in English) the opportunity to ask questions as well. He not only "posed open-ended questions that could elicit relevant responses," but he asked specific follow-up questions that clearly delineated a timeline from which we have a clear understanding of the facts and circumstances of the case. *Id.* at 507. And contrary to other cases in which the "superficial quality of the questioning" spanning less than 15 pages of transcribed testimony deprived a petitioner of a full and fair hearing, the IJ in this case dutifully developed the record over almost 300 pages of testimony. *Id.* (quoting *Lashley v. Sec'y of Health & Hum. Servs.*, 708 F.2d 1048, 1053 (6th Cir. 1983)).

On appeal, Elgebaly faults the IJ for failing to elicit testimony about specific topics. For example, she argues that the IJ failed to ask questions relating to Elgebaly's strict religious and cultural practices that shaped her marriage to Muhammad and failed to impeach Muhammad's credibility. She also claims that the IJ did not inform her of the type of evidence she should submit to establish her good faith marriage claim. Many of these assertions are factually

incorrect.  The IJ did question Elgebaly's son about whether her marriage was in line with her cultural practices.  And the IJ repeatedly advised Elgebaly of her ability to submit supporting documents to the court and granted multiple continuances to allow Elgebaly time to get an attorney.  More broadly, although an IJ must assist a petitioner in developing the record, an IJ does not serve as petitioner's counsel.  *See Richardson v. Perales*, 402 U.S. 389, 410 (1971) (acknowledging that administrative law judges do not "act as counsel"); *see also Mei Zhu Huang v. Holder*, 577 F. App'x 587, 592 (6th Cir. 2014).  In this case, the IJ sufficiently developed the record for our review, and ably discharged the role that the Constitution requires he play.

### B.  Motion to Reopen

Elgebaly also challenges the BIA's denial of her motion to reopen the proceedings.  We review a denial of a motion to reopen for an abuse of discretion.  *Zhang v. Mukasey*, 543 F.3d 851, 854 (6th Cir. 2008).  The BIA abuses its discretion if its decision "was made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination against a particular race or group."  *Dieng v. Barr*, 947 F.3d 956, 960–61 (6th Cir. 2020) (citation omitted).

The BIA may deny a motion to reopen for any of at least three independent reasons: (1) the motion does not "establish[] a prima facie case for the underlying substantive relief sought"; (2) the motion does not present "previously unavailable, material evidence"; or (3) if a movant seeks discretionary relief, the movant would not be entitled to such relief.  *I.N.S. v. Abudu*, 485 U.S. 94, 104–05 (1988).  Because of the strong public interest in the finality of immigration proceedings, motions to reopen are generally "disfavored."  *Id.* at 107.

In this case, the BIA determined that the evidence proffered in Elgebaly's motion to reopen was either not new or not material.  We "strictly" construe the requirement that evidence could not have been presented at the prior hearing.  *Sakhawati v. Lynch*, 823 F.3d 852, 858 (6th Cir. 2016).  The text messages and photographs submitted by Elgebaly in her motion to reopen were either already submitted in prior proceedings or were available to her in the prior proceedings.  Additionally, although her statement alleged that she feared returning to Egypt because of threats from her deceased husband's family, some of these threats were made while

she was married to Muhammad. Rather than explain these threats in the prior proceedings, she expressly testified before the IJ that she had "no specific fear" of returning to Egypt. Administrative Record, No. 23-3877, ECF No. 8-2, Page ID #403. On appeal, Elgebaly argues that, although much of this information was available to her during the prior hearings, it was practically unavailable because of her *pro se* status. But as the BIA found, nothing rendered the proceedings before the IJ or the BIA fundamentally unfair such that she would have been prevented from presenting the available evidence merely because she proceeded *pro se*. The BIA therefore did not abuse its discretion in finding that the evidence in Elgebaly's motion to reopen was either already submitted or could have been submitted in prior proceedings.

The BIA also did not err in concluding that any new evidence presented was immaterial. New evidence is material if it is "likely [to] change the result in the case." *Yousif v. Garland*, 53 F.4th 928, 936 (6th Cir. 2022) (alteration in original) (quoting *Hernandez-Perez v. Whitaker*, 911 F.3d 305, 321 (6th Cir. 2018)); *see also Jado v. Wilkinson*, 847 F. App'x 278, 284 (6th Cir. 2021). Elgebaly's reports of Egyptian culture and Muslim religious customs concerning marriage did not undermine the previous finding that she did not marry in good faith. Specifically, none of this evidence rebutted either Muhammad's testimony that the marriage was not in good faith, that they never lived together, or that they never shared a joint bank account.

Further, although some of Elgebaly's statement submitted with her motion contained new evidence, the BIA also did not err in finding this evidence immaterial. Elgebaly claimed to be afraid of her deceased husband's family in Egypt in part because of threats they made after her son's marriage to a non-Sunni Muslim. Although this happened after the immigration proceedings, thus making it at least new evidence, the BIA did not abuse its discretion in finding that it was immaterial to her hardship waivers because the evidence did not address whether her marriage to Muhammad was in good faith.[1] In all, the BIA did not abuse its discretion in denying Elgebaly's motion to reopen.

---

[1]To the extent that this information could be construed as an attempt to seek alternative relief from removal, such as asylum, the BIA properly concluded that Elgebaly's request was procedurally defaulted because she did not append an asylum application to her motion to reopen or otherwise seek removal relief in another form from the BIA. *See Bi Feng Liu v. Holder*, 560 F.3d 485, 491 (6th Cir. 2009) (finding a motion to reopen

### C. Constitutionality of Immigration Proceedings

Finally, Elgebaly mounts a constitutional challenge to the structure of immigration court proceedings. Specifically, she points us to the Supreme Court case, *SEC v. Jarkesy*, which considered whether specific administrative proceedings violated the Seventh Amendment right to a jury trial in suits at common law. 144 S. Ct. 2117 (2024). At the time of briefing, the Supreme Court had not released its decision in *Jarkesy*, so Elgebaly merely indicated that immigration proceedings without a jury could violate the Seventh Amendment depending on the Court's decision.

In the interim, the Supreme Court has released its decision in *Jarkesy*, meaning we can easily dispose of Elgebaly's suggestion. The Court held that enforcement proceedings in the Securities and Exchange Commission ("SEC") that sought civil penalties violated defendants' Seventh Amendment right to a jury trial. *See id.* at 2127–28. In doing so, the Court explained that this was because the SEC enforcement proceedings at issue affected the private rights of defendants, meaning adjudication could not be removed from an Article III court. *Id.* at 2132, 2136. By contrast, it explained that initial adjudications of public rights could be conducted by the executive branch. *Id.* at 2132. And it explicitly referenced immigration as just such an example of a matter concerning public rights. *Id.* at 2132–33; *see also Crowell v. Benson*, 285 U.S. 22, 50–51 (1932) (listing immigration as an issue concerning public rights). Thus, to the extent that Elgebaly continues to press this constitutional challenge after the release of the Court's decision in *Jarkesy*, it would be unsuccessful because *Jarkesy* clearly does not implicate immigration adjudication.

### III. CONCLUSION

For the reasons stated above, we **DENY** Elgebaly's petitions for review.

---

procedurally defaulted for failing to comply with 8 C.F.R. § 1003.23(b)(3) by failing to attach an application for asylum). Notably, Elgebaly does not challenge this specific reasoning on appeal.