NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0645n.06
Filed: August 31, 2007

Case No. 06-3977

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

MANSOUR SALL,                                  )
                                               )
        Petitioner,                            )
                                               )          ON APPEAL FROM THE
        v.                                     )          BOARD OF IMMIGRATION
                                               )          APPEALS
ALBERTO R. GONZALES, Attorney                  )
General,                                       )
                                               )
        Respondent.                            )
                                               )
_____       )

BEFORE:  BATCHELDER and DAUGHTREY, Circuit Judges; ROSEN,[*] District Judge

    **ALICE M. BATCHELDER, Circuit Judge.**  Petitioner Mansour Sall ("Sall") appeals the

decision of the Board of Immigration Appeals ("BIA") affirming the Immigration Judge's ("IJ")

denial of Sall's asylum application and request for withholding of removal.  Finding no merit in

Sall's contentions on appeal, we **DENY** Sall's petition for review of the BIA's decision.

**I.**

    Sall claims to be a citizen and national of Mauritania, with ties to both the Fulani and Wolof

ethnic groups, which are part of the larger group generically referred to as "Black Moors."

Mauritania has a history of conflict between the Black Moors and the White Moors, who from 1989-

_____

[*]The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting
by designation.

1991 committed human rights abuses against the Black Moors, expelling them from the country or forcing them to flee. Sall testified that although his heritage is Fulani, he was surrounded by Wolofs, identifies with their traditions, and speaks their language.

According to Sall, the Mauritanian government seized his family's farmland along the river in Boghe — as well as the land of many of his black neighbors — in July of 1998, and gave it to the White Moors. Sall, his father, mother, and sister were told that "Mauritania is for the White Moors only," and were taken to a military camp in Aleg, Mauritania, where they were mistreated under harsh conditions. At least eighty other Fulanis and Wolofs were held at the Aleg military camp, and each day the soldiers forced the detainees to make and carry bricks. Sall claims that the soldiers beat him with a rope, leaving a scar on his back. After fifteen days, the soldiers took Sall and the others to the river and forced them to cross into the neighboring country of Senegal. Sall and his family were taken to a refugee camp in Podor, Senegal, which housed over 100 refugees, and Sall remained there for three years. Sall claims that while he was at the Podor refugee camp, he met a smuggler who offered to pay his travel fare to the United States and provide a passport that Sall could use to enter the country, on the condition that Sall would later repay him $4,000. On August 7th, 2001, Sall arrived in the United States via JFK Airport in New York. Sall then settled in Columbus, Ohio, for eight months before moving to Louisville, Kentucky, where he began working and taking English classes.

Sall claims that if he were to return to Mauritania, the government would kill him. He testified that his wife sent him a letter, explaining that Sall's uncle, Ablaye Sall, attempted to re-enter Mauritania, but was beaten so severely by the Mauritanian soldiers at the border that he died upon his return to Senegal. Sall produced the letter from his wife as evidence of his uncle's death, but,

contrary to his testimony, the letter itself did not reference his uncle in any way, although it was accompanied by a copy of what Sall claimed was his uncle's death certificate.

On April 8, 2002, Sall filed an application for asylum and for withholding of removal based on race and membership in a particular social group, and for withholding of removal under the Convention Against Torture. The Department of Homeland Security filed a Notice to Appear with the Immigration Court, noting that Sall was removable as an alien who did not possess a valid entry document. Following a hearing, the IJ concluded that Sall was not a credible witness because, despite professing to be a farmer, he lacked knowledge of Mauritanian agricultural terminology and procedures; he was not aware of important events which occurred in his country when he was a teenager (i.e., the expulsion of 70,000 Black Moors in 1989-91); he provided vague testimony regarding his arrest and incarceration; and his overall story was inconsistent with the country's conditions in 1998. The IJ also held that Sall failed to show by clear and convincing evidence that he filed his asylum application within one year of his arrival in the United States because the only evidence of his arrival date was "his own less than credible testimony." Even if the application were timely, however, the IJ concluded that Sall did not show past persecution or a well-founded fear of future persecution and denied his requests for asylum, withholding of removal, and relief under the Convention against Torture. The only evidence indicating that Sall would be tortured was the letter from Sall's wife, which was inconsistent with "background material." Finally, the IJ concluded that Sall's request for asylum should fail for an additional reason, namely, his three-year residence in Senegal created a presumption that he had firmly resettled there. *See* 8 C.F.R. § 208.13 (stating that applicants who have "firmly resettled" are mandatorily denied asylum status); *id.* § 208.15 (defining "firm resettlement").

The BIA found that Sall did in fact meet the one-year statutory filing deadline because his "clear and consistent testimony" regarding his arrival date was not rebutted by any contradictory evidence. The BIA then concluded that the IJ's adverse credibility finding was not clearly erroneous, citing as support Sall's vague testimony regarding his farm in Mauritania, his unfamiliarity with pertinent agricultural terminology, and his vague testimony regarding his arrest and period of incarceration. The BIA also held that political changes in Mauritania negated Sall's alleged fear of persecution. The BIA authorized Sall's voluntary departure from the United States, and Sall filed a petition for review.

## II.

"The IJ, acting for the Attorney General, has discretion to grant asylum to any alien who qualifies as a 'refugee.'" *Yu v. Ashcroft*, 364 F.3d 700, 703 (6th Cir. 2004). We review "administrative findings of fact concerning whether [an] alien qualifies as a refugee under a substantial evidence test." *Ramani v. Ashcroft*, 378 F.3d 554, 558 (6th Cir. 2004). Credibility determinations are findings of fact reviewed for substantial evidence. *Yu*, 364 F.3d at 703. Such factual findings are deemed "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). Thus, this court may not reverse simply because it would have decided the case differently, *Mikhailevitch v. INS*, 146 F.3d 384, 388 (6th Cir. 1998), but may reverse only if the petitioner's evidence *compels* a contrary conclusion, *Rreshpja v. Gonzales*, 420 F.3d 551, 554 (6th Cir. 2005); *see also INS v. Elias-Zacharias*, 502 U.S. 478, 483-84 (1982) ("[T]o obtain judicial reversal of the BIA's determination, [the petitioner] must show that the evidence he presented was so compelling that no reasonable fact finder could fail to find [in the petitioner's favor].").

4

Sall challenges the BIA's finding that he was not a credible witness. As an applicant for asylum, Sall bears the burden of demonstrating that "persecution is a reasonable possibility should he be returned to his country of origin." *Perkovic v. INS*, 33 F.3d 615, 620 (6th Cir. 1994). "The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. §§ 208.13(a), 208.16(b). "Accordingly, a credibility determination forms the initial consideration in an IJ's asylum claims analysis." *Mapouya v. Gonzales*, 487 F.3d 396, 406 (6th Cir. 2007). An applicant is credible if his or her "testimony is believable, consistent, and sufficiently detailed to provide a plausible and coherent account." *Perkovic*, 33 F.3d at 621.

Although an adverse credibility finding "is afforded substantial deference," it "must be based on issues that go to the heart of the applicant's claim," and any discrepancies must "be viewed as attempts by the applicant to enhance his claims of persecution." *See Sylla v. INS*, 388 F.3d 924, 926 (6th Cir. 2004). An adverse credibility determination "cannot be based on an irrelevant inconsistency," *Daneshvar v. Ashcroft*, 355 F.3d 615, 619 n.2 (6th Cir. 2004), but "must be supported by specific reasons," *Liti v. Gonzales*, 411 F.3d 631, 637 (6th Cir. 2005).

We find substantial evidence to support the BIA's adverse credibility finding. Sall's claim that he was a Mauritanian farmer was rebutted by his inability to state the size and location of his family's farmland, as well as his unfamiliarity with well-known Mauritanain agricultural terminology. Sall could not even name the river that divides Mauritania and Senegal, which was purportedly within walking distance of his home. Sall's testimony regarding his alleged arrest and incarceration by Mauritanian authorities — which is the crux of his entire claim — was strikingly lacking in detail. This "plainly vague and ambiguous" testimony and his "fail[ure] to articulate meaningful responses to the questions he was asked at the hearing" suggest that he was not credible.

5

*See Neziraj v. Gonzales*, 207 F. App'x 550, 556 (6th Cir. 2006) (unpublished case) (upholding the BIA's conclusion that an applicant was not credible, where the applicant "could not offer any specific details about his abductions, interrogations and detentions," and his testimony of a police beating was "cursory and without meaningful elaboration"); *Perkovic*, 33 F.3d at 615. Because the confiscation of Sall's farmland and the subsequent arrest, detention, and expulsion from Mauritania form the very basis of his claim for asylum, these issues undoubtedly "go to the heart of [his] claim." *See Sylla*, 388 F.3d at 926.

While "[t]he alien's own testimony can be sufficient to support an application for asylum where the testimony is believable, consistent, and sufficiently detailed to provide a plausible and coherent account of the basis for his fear," *Pilica v. Ashcroft*, 388 F.3d 941, 954 (6th Cir. 2004) (quotations omitted), corroborating evidence is needed where the applicant's testimony is lacking in detail so as to call into question his credibility. "[W]here it is reasonable to expect corroborating evidence . . . [t]he absence of such corroborating evidence can lead to a finding that an applicant has failed to meet her burden of proof." *Dorosh v. Ashcroft*, 398 F.3d 379, 382 (6th Cir. 2004) (quotations omitted). Sall has presented no credible corroborating evidence. He failed to produce a witness for his hearing, even though the IJ had warned him and his counsel that "we certainly need a witness, if not somebody who knew him in Africa then someone who knows him well here," because "[w]e need proof of his identity." Sall's failure to provide witness corroboration is damaging to his claim because it is not clear that he is even from Mauritania. The United States State Department's 1997 Mauritania Profile of Asylum Claims and Country Conditions, which the IJ relied upon, reports that many Senegalese asylum applicants profess to be from Mauritania "because they feel their chances of obtaining asylum are enhanced by the largely ethnic-based human

6

rights abuses in Mauritania between 1989 and 1991." Moreover, "[i]t is particularly easy for Senegalese to pretend to be Mauritanians because they may be from one of the same ethnic groups as Afro-Mauritanians." During cross-examination, in response to a question about Mauritanian farming terminology, Sall admitted that "walo is a, a area that is well-known in Senegal" — a slip of the tongue suggesting that he is most likely from Senegal, not Mauritania.

Sall did present a copy of an identification card with his name and picture and which designated his nationality as Mauritanian. But the identification card's authenticity is extremely questionable in light of the State Department's finding that fraudulent documentation is a common problem when dealing with Mauritanian asylum applicants. In addition, Sall's testimony that the Mauritanian authorities checked his identification and returned it to him before expelling him was inconsistent with the Mauritanian authorities' practice of confiscating arrestees' identification before expelling them from the country, as reported by the State Department.

Sall also provided a letter, purportedly from his wife in Senegal, which described the massacre of Black Moor refugees by Mauritanian soldiers when the refugees tried to reenter Mauritania to reclaim their land. Quite to the contrary, the State Department 2003 Mauritania Country Report on Human Rights Practices states that many refugees have returned from Senegal to Mauritania and have "received their original homes, some property, and all or a portion of their land." The report also notes that in 2003 "there were [only] three reported unlawful killings by security forces." As the IJ noted, if Sall's wife's claim were true, it would certainly have come to the attention of the State Department and been included in its country report. The letter from Sall's wife is inherently implausible, considering the actual state of affairs in Mauritania at this time. The authenticity of Sall's uncle's death certificate, which was sent with the letter, is also extremely

7

questionable; instead of describing the wounds which caused the death, it states the geographical location where the beating allegedly occurred. The letter and death certificate appear to be an attempt by Sall "to enhance his claims of persecution." *See Sylla*, 388 F.3d at 926.

Not only did Sall fail to provide credible corroborating evidence, but the available objective evidence is entirely inconsistent with Sall's claimed persecution. When making a credibility determination, courts may take into account "the consistency of [the applicant's] statements with other evidence of record (including the reports of the Department of State on country conditions)." 8 U.S.C. § 1158(b)(1)(B)(iii). Sall's story is not believable in light of the conditions in Mauritania in 1998. The State Department's 1998 Mauritania Country Report on Human Rights Practices states that during this time period, the Mauritanian government was actively working with human rights organizations "to assist returnees from Senegal and Mali." Approximately 40,000 to 65,000 of the 70,000 refugees had safely returned to Mauritania by this time. Moreover, in 1998 there was only "one known extrajudicial killing by the security forces," and "[t]he government no longer employ[ed] forced exile." The Mauritanian government "continued efforts to encourage the return of southerners who had been expelled or who had fled during 1989-91."

These "U.S. State Department reports, 'which are generally the best source of information on conditions in foreign nations,' provide context about [Mauritania] so that the fact finder may assess [Sall's] credibility." *See Sterkaj v. Gonzales*, 439 F.3d 273, 276 (6th Cir. 2006) (citation omitted) (quoting *Mullai v. Ashcroft*, 385 F.3d 635, 639 (6th Cir. 2004)). In light of these reports, Sall's story — if true — would be an extraordinary exception to the general atmosphere in Mauritania in 1998. It is extremely unlikely that a government that is actively participating in the return of Black Moor refugees would simultaneously capture, torture, and exile "at least eighty"

8

Black Moors, as Sall claims. Nevertheless, the State Department Report does lend limited support to Sall's story. The report notes that in 1998:

> There were a number of unconfirmed reports that the Government confiscated the farmland of members of southern ethnic groups in or near the Senegal River valley and redistributed it to members of the dominant White Moor ethnic group, leaving Southern farmers landless, forcing a number of them into the cities, and impelling some to flee the country . . . . There were [also] a number of unconfirmed reports that security forces physically abused or detained southerners in the course of confiscating their farmland for redistribution to White Moors.

Thus, although Sall's story is not entirely implausible in light of the country reports, we must defer to the substantial evidence indicating that Sall was not a credible witness: his testimony regarding his farm, his arrest, and his detention were lacking in detail; he failed to provide a corroborating witness; his claim that the Mauritanian authorities let him keep his identification was inconsistent with their reported practice; the story of his uncle's death was not in his wife's letter as he testified it was; and his story was inconsistent with the general conditions in Mauritania, as described in the State Department reports. Thus, the BIA's finding that Sall was not a credible witness is supported by substantial evidence, and no evidence compels us to reach a contrary conclusion. *See, e.g.*, *Sterjak*, 439 F.3d at 276 (upholding an adverse credibility determination where country reports did not entirely rule out the possibility that applicant's story was true, but the reports were ultimately inconsistent with and thus undermined the applicant's claim).

Even if we were to find Sall credible, we would nevertheless conclude that substantial evidence supports the BIA's alternative holding that changed circumstances in Mauritania prevented Sall from proving a well-founded fear of persecution. To qualify as a refugee, Sall must prove that he is unwilling to return to Mauritania "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political

9

opinion." 8 U.S.C. § 1101(a)(42)(A). An asylum application must be denied, however, where the preponderance of the evidence establishes that "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality." 8 C.F.R. § 1208.13(b)(1)(i)(A). The 2003 State Department Report states that many of the former refugees have returned to Mauritania, that the Mauritanian government is cooperating with humanitarian groups to assist returning refugees, and that the government has returned property to many of the refugees. Therefore, substantial evidence supports the BIA's determination that changed circumstances bar Sall's application for asylum. *See, e.g.*, *Mullai*, 385 F.3d at 639 (upholding BIA's determination that even if applicant faced past persecution, changed country conditions evidenced in the State Department reports negated the applicant's claim of well-founded fear of future persecution because she could not show that the *current* government would target her for persecution).

We also note that the BIA properly denied Sall's request for withholding of removal. Because the "clear probability" standard required for withholding of removal is "more stringent" than that required for asylum, *Daneshvar*, 355 F.3d at 625, Sall's withholding of removal claim necessarily fails on the same grounds as his asylum claim.

**III.**

For the foregoing reasons, we **DENY** Sall's petition for review.