NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0255n.06
Filed: May 15, 2008

No. 07-3431

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| MAMADOU OUMAR SY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | ON PETITION FOR REVIEW FROM A |
| v. | ) | FINAL ORDER OF THE BOARD OF |
| | ) | IMMIGRATION APPEALS |
| MICHAEL B. MUKASEY, Attorney General, | ) | |
| | ) | |
| Respondent. | ) | |

Before: DAUGHTREY, COOK, and FARRIS,[*] Circuit Judges.

COOK, Circuit Judge. Petitioner Mamadou Oumar Sy, a native and citizen of Mauritania,

seeks review of a final removal order. Finding that substantial evidence supports the Immigration

Judge's determination that changed country conditions preclude Sy's asylum, withholding-of-

removal, and Convention Against Torture ("CAT") claims, we deny his petition for review.

I.

In 2003 Sy entered the United States using another person's Senegalese passport and visa.

After living here for nearly a year, he filed an application for asylum, withholding-of-removal, and

---

[*]The Honorable Jerome Farris, Circuit Judge of the United States Court of Appeals for the
Ninth Circuit, sitting by designation.

CAT relief, alleging that he suffered persecution for his Fulani political and cultural activities and continues to fear for his safety.

According to his testimony, Sy lived with his wife and seven children in Mauritania's capital, Nouakchott, where he worked as an accountant for the Ministry of Finance. Beginning in 1989, he joined political opposition groups dedicated to cultivating Fulani culture and language.[1] In 1994 he refused to sign a document that would disburse government money for partisan purposes, prompting a summons to the police station. There, officers interrogated him about his affiliation with opposition groups and beat him.

After three days the police released him, and, despite the arrest, he remained in his government position and later joined the Union of Democratic Forces ("UFD") political party. A few years passed without incident until the day he was to lead a meeting of the Fulani Association. Police officers arrested him, saying he failed to obtain permission to hold the meeting. They took Sy to an isolated house and demanded to know why the Fulani Association excluded other racial and ethnic groups. During Sy's three months at the house, police burned him with cigarettes and strung him up by his ankles. Upon release he retained his job, but was demoted and stripped of most responsibilities.

---

[1]The Fulanis "are part of the larger group generically referred to as 'Black Moors.' Mauritania has a history of conflict between the Black Moors and the White Moors, who from 1989–1991 committed human rights abuses against the Black Moors, expelling them from the country or forcing them to flee." *Sall v. Gonzales*, 239 F. App'x 975, 976 (6th Cir. 2007).

When the ruling party banned the UFD, Sy joined the soon-to-be-banned Action for Change ("AC") political party. Police arrested Sy as he protested the AC ban and took him to yet another house, where they beat him to extract information about the AC's agenda. To secure his release this time, Sy had to pool family resources to pay $3,000. The Ministry then fired him, and he became a merchant to support his family.

Finally, the political clash peaked when officers came to Sy's house while he was out and, accusing Sy of holding secret meetings, beat his wife. They left behind a police summons. Fearing for his life, Sy evaded the summons by crossing into neighboring Senegal. His wife and children also left Nouakchott, retreating to the couple's remote home village. Sy worked for a Senegalese man for about a year, and (benefitting from of a common name) eventually purchased a Senegalese passport and American visa issued to a Mamadou Sy.

After hearing this testimony, the IJ found Sy's claim of past persecution credible. The IJ concluded, however, that the Government obviated Sy's fear of future persecution by showing changed country conditions. The IJ alternatively held that negative discretionary factors foreclosed Sy's asylum claim. Without the well-founded fear of future persecution he needed to qualify for asylum, Sy could not satisfy the more demanding standards for withholding-of-removal or CAT relief. The IJ accordingly ordered Sy removed to Mauritania. The Board of Immigration Appeals ("BIA") affirmed the IJ's decision in a brief opinion. Sy now disputes the quality and the quantity of the evidence supporting changed country conditions.

II.

The BIA summarized the IJ's legal conclusions, commenting briefly about Sy's ineligibility for humanitarian asylum and rejecting Sy's argument that the IJ made a factual mistake. When the BIA adopts the IJ's reasoning, we review the IJ's opinion directly, considering any additional comments the BIA contributed. *Gilaj v. Gonzales*, 408 F.3d 275, 282–83 (6th Cir. 2005) (per curiam).

A. Asylum

"[T]his court reviews administrative findings of fact concerning whether the alien qualifies as a refugee under a substantial evidence test," *Ramani v. Ashcroft*, 378 F.3d 554, 558 (6th Cir. 2004), and thus will overturn them only if "any reasonable adjudicator would be *compelled* to conclude to the contrary," 8 U.S.C. § 1252(b)(4)(B) (emphasis added). This court's view that "it would have decided the case differently," then, does not defeat a finding of substantial evidence. *Sylla v. INS*, 388 F.3d 924, 925 (6th Cir. 2004) (quoting *Klawitter v. INS*, 970 F.2d 149, 151–52 (6th Cir. 1992)).

The Attorney General may grant asylum to a "refugee"—an alien who cannot return to his or her native country because of "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion," 8 U.S.C. § 1101(a)(42)(A)—if the alien credibly demonstrates past or prospective persecution, *see id.*

§ 1158(b)(1)(A), (B) (authorizing the Attorney General to grant asylum and burdening the alien with demonstrating refugee status). By establishing past persecution, an alien triggers a rebuttable presumption of future persecution. *Ouda v. INS*, 324 F.3d 445, 452 (6th Cir. 2003); 8 C.F.R. § 208.13(b)(1). A preponderance showing of "a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality" rebuts that presumption. 8 C.F.R. § 208.13(b)(1)(i)(A). The alien may then still establish a subjectively and objectively well-founded fear of persecution. *See Mikhailevitch v. INS*, 146 F.3d 384, 389 (6th Cir. 1998).

And even if the alien establishes a well-founded fear of persecution, the alien still must establish that the totality of the circumstances warrants a favorable exercise of discretion. *Kouljinski v. Keisler*, 505 F.3d 534, 542 (6th Cir. 2007). This court cannot disturb the discretionary decision unless it is "manifestly contrary to the law and an abuse of discretion." 8 U.S.C. § 1252(b)(4)(D).

### 1. Past Persecution

Sy's past persecution is not in dispute. Sy detailed escalating reprisal for his political activities, and the IJ found his account credible; indeed, Sy carries the scars to prove his beatings. Bolstering his credibility, he submitted several documents verifying his identity, including a marriage certificate, an airplane ticket, photographs, and his children's birth certificates.

2. Changed Country Conditions

Improving conditions in Mauritania since Sy's departure, however, doom his petition. According to the record, in August 2005 a bloodless coup ousted President Maaouiya Ould Sid Ahmed Taya and replaced him with a former security minister, Colonel Ely Ould Mohamed Vall. The IJ found that, with the advent of new Mauritanian leadership, Sy is no longer a political enemy at risk for future persecution. Sy disputes that Mauritanians enjoy an improved governmental climate under Colonel Vall, faulting the IJ for discounting a 2004 letter from his wife warning of trouble at home.

The evidence of changed conditions consists entirely of Internet news articles. Although Sy characterizes the articles as "internet gossip," he ignores the broad array of evidence permitted in immigration courts, including "material provided by the Department of State, the Office of International Affairs, other Service offices, or other credible sources, such as international organizations, private voluntary agencies, news organizations, or academic institutions." 8 C.F.R. § 1208.12(a). Here, sources include an international organization, the UN Office for the Coordination of Humanitarian Affairs; and BBC News. Sy himself submitted Internet news articles from these same sources, which suggests they may be among limited channels for news of Mauritania.

That said, Sy argues that the IJ wrongly favored the Government's articles as more recent, pointing out the slim time frame during which they were published. But the stark differences evident

in the articles' short time frame actually seem to reflect speedy progress for the new regime. Although initial commentators were confused about what the coup wrought and were concerned about the transfer of power, the African Union and the United States soon acknowledged the new leaders. *See* J.A. 135, 138–39, 168–71. Acknowledgment built to international support as the new government promised democratic elections and delivered widespread amnesty to former-President Taya's political enemies. *See* J.A. 136–37. Sy testified that he would not benefit from the pledged amnesty, but the record includes an article saying that Colonel Vall promised "general, full and complete amnesty to *all* Mauritanians condemned for political crimes or offences" with only twenty named exceptions. J.A. 141 (emphasis added). Undermining Sy's claim to well-founded fear, other dissidents trusted the amnesty and returned to Mauritania, and the country's jails released "over 100 political prisoners." J.A. 143–44.

Sy insists that the new regime has brought only cosmetic changes, pointing to Colonel Vall's alleged supervision of jail interrogation during the past regime. *See* J.A. 166–67. On balance, however, substantial evidence supports more than a sham change of power. According to the Government's evidence, none of former-President Taya's ministers remain in power except Ahmed Ould Sid'Ahmed and Colonel Vall. J.A. 136. Responding to the new leadership, a key figure in Sy's erstwhile opposition group said, "We are very happy with the change." J.A. 134.

Sy presented only one source of objective knowledge about conditions in Mauritania in the two years since he left. By letter, Sy's wife warned him not to return because as an "active and

dangerous opponent," he could be killed or imprisoned for life. J.A. 159. "All your friends have been arrested," she said, and "[w]e don't know anything about them." J.A. 159. But the IJ could appropriately give little weight to the letter because it was dated almost a year *before* the coup.

Addressing Sy's concerns about Mauritania's general persecution of Fulanis, the IJ cited Sy's own testimony that Fulani language reemerged in school classrooms, showing progress for the organizations Sy supported. On this point, we note in several of our opinions that improving conditions for Fulanis since the 1989 abuses have persuaded many former refugees to return. *See, e.g.*, *Fall v. Gonzales*, 218 F. App'x 385, 388–89 (6th Cir. 2007); *Camara v. Gonzales*, 133 F. App'x 989, 991 (6th Cir. 2005); *Seck v. Ashcroft*, 93 F. App'x 721, 723 (6th Cir. 2004). Thus, although Sy may subjectively, *i.e.*, genuinely, fear future persecution, we find this record lacking an objective basis for such fear to rebut the Government's showing of changed country conditions. Accordingly, substantial evidence supports the IJ's decision denying Sy asylum.

As country conditions dispose of Sy's asylum claim, we do not reach the issue of whether he would be entitled to a favorable exercise of discretion. And we do not address humanitarian asylum because Sy did not brief the issue.

B. Withholding of Removal

Withholding of removal requires an alien to prove a "clear probability of persecution." *Ali v. Ashcroft*, 366 F.3d 407, 411 (6th Cir. 2004) (quoting *INS v. Stevic*, 467 U.S. 407, 430 (1984)).

Sy presents no developed argument about his entitlement to withholding of removal, and even if he properly presented this claim, he necessarily cannot satisfy the more stringent clear-probability standard after failing to establish well-founded fear for his asylum claim. *See Koliada v. INS*, 259 F.3d 482, 489 (6th Cir. 2001) (per curiam).

### C. Convention Against Torture

CAT relief requires Sy to show that torture will "more likely than not" ensue on his return, 8 C.F.R. § 1208.16(c)(2), and this burden is "significantly greater than the burden required to demonstrate eligibility for asylum," *Sarr v. Gonzales*, 485 F.3d 354, 362 (6th Cir. 2007). Sy described past incidents of torture, but as with a withholding-of-removal claim, a CAT claim fails if an applicant cannot meet the well-founded-fear standard for asylum. *Ceraj v. Mukasey*, 511 F.3d 583, 594 (6th Cir. 2007).

### III.

For these reasons, we deny Sy's petition for review.