NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0616n.06

No. 09-3545

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Sep 16, 2010**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| AMADOU OUMAR LY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES BOARD OF IMMIGRATION |
| ERIC HOLDER, Jr., United States | ) | APPEALS |
| Attorney General, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| | ) | |

Before: GIBBONS and KETHLEDGE, Circuit Judges; and SARGUS, District Judge.[*]

**JULIA SMITH GIBBONS, Circuit Judge.** Petitioner Amadou Oumar Ly appeals from a decision of the Board of Immigration Appeals ("BIA") denying his motions for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). For the reasons that follow, we deny Ly's petition for review.

I.

Ly, allegedly a native and citizen of Mauritania, requests review of his application for asylum to escape the torture and persecution that he purportedly experienced in Mauritania between 1989 and 2000. In his first asylum application filed on June 28, 2001, Ly claimed that he had been an

---

[*] The Honorable Edmund A. Sargus, Jr., United States District Judge for the Southern District of Ohio, sitting by designation.

active member of the Gatta Association of Culture and had voted for the opposition party ("the UFD") in 1992 and 1997. He also claimed that he was attacked and imprisoned one time because of his support for the UFD and because of his Fulani race. With regards to this first application, Ly later testified that he cannot read or write English, Fulani, or French, and therefore had a layperson fill out his initial application for him after Ly provided the person with a few bare facts.

Ly eventually amended his asylum application on June 22, 2006—approximately five years later. This time, Ly claimed that he had been arrested a total of eight times while in Mauritania, each time because white Moor soldiers demanded money from him. He did not claim that he was arrested because he was Fulani, because of any political activities, or because he was not Mauritanian.

Between the time Ly filled out his asylum application and the day of his hearing, Ly met with an asylum officer. The notes taken by the asylum officer during that meeting indicate that Ly stated he had been arrested three times. Ly purportedly offered different reasons than he had previously offered to the government for these three arrests. The IJ admitted this evidence for impeachment purposes.

At the hearing before the IJ, Ly's testimony was not consistent with either his first asylum application, the amended asylum application, or the asylum officer's interview notes. Rather, Ly claimed at the hearing that military officers came to his shop five times, beat him, and took him to a military camp because "[t]hey told me I was not Mauritanian, I was a Senegalese." Ly further testified that each of the five times he was arrested, he had to pay the military officials to secure his release. Ly showed the court multiple scars and markings on his body as evidence of military torture.

Ly's testimony contained several other inconsistencies. For instance, Ly testified that his older brother lives in France and that his younger brother served in the Mauritanian military but died in 1990. However, when questioned by the government on cross-examination, Ly was unable to provide the court with any details concerning his brother's position as sergeant major, which he allegedly held before he was killed at the age of twenty. Ly provided the court with a birth certificate and claimed initially that it was the original given to him by his parents and that he had possessed it since birth. However, on cross-examination the government asked Ly why the certificate was dated November 26, 2000. Ly then changed his testimony and claimed that he had left his original in his rush to leave Mauritania and had received this replacement, which a friend had obtained "through one of his friends who works for the government."

Ly was also questioned about three letters he offered as exhibits: one from a person he claimed to be his friend, one from the person Ly claimed to be his brother, and the third from the person Ly claimed to be his wife. All of the letters were written in French—a language that Ly claims he cannot read. When asked why these people wrote letters to him in a language that he could not read, Ly responded, "[w]ell, they probably don't understand it that some people who will read it to me, and explain it to me."

Ly introduced the first letter—allegedly sent from his brother in France—to support his claim that he feared persecution upon return to Mauritania. The letter warns Ly not to return to Mauritania and asserts that two of Ly's friends are being detained by the Mauritanian military. When asked about these individuals, Ly claimed they were his relatives. But when the government then asked Ly why he previously testified that he did not have any living relatives in Mauritania, Ly only

explained: "Earlier you did not talk, mention the letter, so I did not talk about them." The government then questioned Ly regarding the two letters allegedly sent from his wife and friend living in Senegal. The letters tell Ly not to return to Mauritania because the military is looking for him. Ly could not explain, however, how his wife and friend in Senegal could know that the Mauritanian government was looking for Ly in Mauritania.

After hearing the testimony and observing Ly's behavior, the IJ found Ly to be not credible. Specifically, the IJ found:

> [Ly's] testimony was vague in places, non-responsive, and evasive in places on cross-examination, implausible in other places, internally inconsistent in still other places, not consistent in places with one or both of his written asylum applications, and not consistent in other places with what he told the asylum officer at his interview. Particularly on cross-examination, the respondent did not appear to answer all questions sincerely and forthrightly.

The IJ supported its adverse credibility determination with several specific examples. First, the IJ found Ly's accounts regarding his arrests by the Mauritanian military to be inconsistent. The IJ found it implausible that Ly claimed to have been arrested one time in his original asylum application, three times in his interview with an asylum officer, eight times in his second asylum application, but then five times in his in-court testimony before the IJ.

Second, the IJ found Ly's testimony implausible and inconsistent as to the reasons why he was arrested by the Mauritania military. Ly claimed that he was arrested first for supporting the opposition party, then because of his race, then because he was from Senegal and not Mauritania, and finally because the military wanted money from him. The IJ found that Ly did not adequately reconcile the discrepancies in his testimony and that Ly offered no other evidence aside from his own

4

inconsistent statements linking his scars, burns, and other injuries from the alleged arrests to any action by the military on account of his race or ethnicity.

Third, the IJ noted the discrepancy regarding his family and personal records. The IJ found it inherently implausible that Ly could grow up with his brother, live in the same house with him, and not remember what year he left for the military. The IJ found it difficult to comprehend how Ly's brother could earn such a high rank as sergeant major before he died at twenty years of age. Because Ly struggled to give the court any details about his brother, the court found it possible that the person Ly claimed to be his brother was in fact not related to him at all. These concerns about Ly's personal family history were compounded by his inconsistent account of the authenticity of his birth certificate. As a result of Ly's inconsistent testimony, and his failure to explain those discrepancies, the IJ found that Ly lacked credibility and therefore denied his application for asylum.

Because of Ly's lack of credibility, the IJ held that Ly failed to meet his burden that he "suffered past persecution in Mauritania on the account of his race, his ethnicity, or on account of any other protected ground." The IJ found further that Ly did not provide sufficient independent evidence to show his injuries were caused by the Mauritanian military. The IJ reasoned that even if the letters from Ly's brother in France and his wife in Senegal were authentic, they did not show past persecution by the Mauritanian government.

In the alternative, the IJ found that even if Ly had suffered past persecution, the political conditions in Mauritania had fundamentally changed and therefore Ly had no objectively reasonable risk of future persecution should he return to Mauritania. The IJ noted that the former President Taya of Mauritania was replaced in a bloodless coup in 2005 and that Mauritania held free and fair

5

elections in 2006 and 2007. The IJ also found that the same letters that failed to say Ly suffered past persecution also failed to establish a well-founded fear that persecutory action would more likely than not be taken against Ly upon return.

Because Ly had not met his burden to receive asylum, the IJ found that he necessarily failed to meet the higher burden for withholding of removal and denied that claim as well. The IJ further held that Ly failed to meet his burden of proof for protection under CAT, finding that Ly did not show that he would more likely than not be tortured upon his return to Mauritania.

Lastly, the court denied Ly's claim for voluntary departure. The IJ ruled that Ly did not show that he had any valid travel documents or that he had valid travel documents upon his arrival in the United States. Furthermore, the court found that he did not show that he could obtain valid documentation to depart from the United States.

The BIA dismissed Ly's appeal, concluding that the IJ did not clearly err in its finding that Ly lacked credibility and that Ly did not meet his burden to establish that he had been persecuted by the Mauritanian military as a result of his race. The BIA further found that even if Ly was credible and that he did establish past persecution, "conditions in Mauritania have changed to such an extent that the respondent no longer has a well-founded fear of persecution." The BIA held that the discrepancies surrounding Ly's arrests were significant facts "because they relate to the central incidents of the claim." The BIA cited the general "conspicuous, inadequately-explained discrepancies in the respondent's testimony and between his testimony and his asylum application." For this reason and the reasons given by the IJ, the BIA affirmed the IJ's adverse credibility determination. The BIA found no error in the IJ's decision denying his application for asylum and

withholding of removal. The BIA further found that Ly provided no substantial evidence to suggest that he was tortured in the past in Mauritania, or that, if he returned, he would be tortured in the future.

Finally, the BIA addressed the evidentiary issues regarding the IJ's decision to admit the asylum officer's interview notes for impeachment purposes. The BIA noted that the Federal Rules of Evidence do not apply in Immigration hearings and that an IJ "may receive into evidence any oral or written statement which is material and relevant to any issue in the case." The BIA concluded that the IJ did not err by admitting the materials for impeachment purposes only.

## II.

"Where the BIA reviews the immigration judge's decision and issues a separate opinion, rather than summarily affirming the immigration judge's decision, we review the BIA's decision as the final agency determination. To the extent the BIA adopted the immigration judge's reasoning, however, this Court also reviews the immigration judge's decision." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009) (internal citations omitted). The court reviews questions of law *de novo* and administrative factual findings by the IJ and BIA under the deferential "substantial evidence" standard. *Id.* Under this standard, findings of fact are "conclusive" unless "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see also Koulibaly v. Mukasey*, 541 F.3d 613, 619 (6th Cir. 2008). "Facts relevant to . . . [the] denial of asylum applications, withholding of removal, and the CAT are all reviewed under this same standard." *Koulibaly*, 541 F.3d at 619.

III.

Ly argues that the IJ erred in making an adverse credibility finding. The law requires that an applicant for asylum must establish that he is a "refugee." 8 U.S.C. § 1158(b)(1). A refugee is a person who is "unwilling or unable to return to" his country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). The applicant for asylum has the burden proving that he is a "refugee." 8 U.S.C. § 1158(b)(1)(B)(i). The applicant's testimony, "*if credible*, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 1208.13(a) (emphasis added). Proof of past persecution offered by the applicant "raises a rebuttable presumption of a well-founded fear of persecution." *Mohammed v. Keisler*, 507 F.3d 369, 371 (6th Cir. 2007) (citing 8 C.F.R. § 208.13(b)(1)). However, the government has an opportunity to rebut this presumption if it can show by a preponderance of the evidence that

> conditions in the applicant's country have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted upon return. The [government] must do more than show that circumstances in the country have fundamentally changed; [it] must also show that such change negates the particular applicant's well-founded fear of persecution.

*Ouda v. INS*, 324 F.3d 445, 452 (6th Cir. 2003) (citations omitted); *see also* 8 C.F.R. § 208.13(b)(1)(i)(A). When the government rebuts the presumption, an applicant "must demonstrate a well-founded fear of future persecution notwithstanding the changed country conditions." *Mapouya v. Gonzales*, 487 F.3d 396, 412 (6th Cir. 2007) (citation and internal quotation marks omitted).

To demonstrate a well-founded fear of persecution, the applicant must satisfy both a subjective and an objective component: "[T]he [applicant] must actually fear that he will be persecuted upon return to his country, and he must present evidence establishing an 'objective situation' under which his fear can be deemed reasonable." *Pilica v. Ashcroft*, 388 F.3d 941, 950 (6th Cir. 2004) (citation omitted). This standard does not require that an applicant "show that he probably will be persecuted if he is deported; 'one can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place.'" *Id.* at 950–51 (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987)).

A.

Our first step is to review whether the record supports the IJ's adverse credibility finding. Ly argues that, because his initial asylum application was prepared by a layperson, discrepancies between the application and his in-court testimony (1) cannot be substantive evidence, and (2) cannot be a basis for the IJ's adverse credibility finding. Further, Ly argues that the BIA upheld the IJ's adverse credibility ruling by considering only Ly's inconsistent testimony concerning the number of times he was arrested. Ly asserts that a discrepancy in the number of times he was arrested does not amount to a material inconsistency. To support his point, Ly contends that "[t]he circumstances surrounding the application process do not often lend themselves to a perfectly complete and comprehensive recitation of an applicant's claim to asylum or withholding, and that holding applicants to such a standard is not only unrealistic but also unfair." *Illeana v. INS*, 106 F. App'x 349, 352 (6th Cir. 2004) (quoting *Secaida-Rosales v. INS*, 331 F.3d 297, 308 (2d Cir. 2003)). Even assuming that a layperson drafted his first application for him, and assuming that Ly did not have

the opportunity to finish telling this person his whole story or read or correct what that person had written, Ly's claim that his testimony was on the whole credible still falls short.

Ly's inconsistent testimony is significant and central to the IJ's adverse credibility finding. Ly failed to explain why several facts, including the number of arrests, in both of his applications did not match the asylum officer's notes, why none of those documents matched his in-court testimony, or even why his in-court testimony on direct examination did not match his testimony on cross-examination. Ly further failed to assert consistently the reason for his repeated arrests. His asylum application stated that he was arrested because he was Fulani, but in court he testified that the military thought he was Senegalese, not Mauritanian, and that they wanted money from him. His testimony regarding the authenticity of his birth certificate is inconsistent, if not entirely unbelievable. Ly's testimony regarding his family history and language abilities was similarly riddled with inconsistencies. Ultimately, Ly had multiple opportunities to set his record straight regarding facts central to his claim but failed to do so. Ly not only failed to establish a clear record, but he changed his assertions so many times that it is difficult to say with certainty which one of his factual accounts is the truth. The IJ's adverse credibility finding was not contrary to substantial evidence. Further, although the BIA specifically mentioned the number of arrests as a reason for its holding, it affirmed the IJ's ruling based on "conspicuous, inadequately-explained discrepancies in the respondent's testimony and between his testimony and his asylum application." Thus, the BIA's ruling was not as narrow as Ly suggests.

Because Ly was found to be not credible, he cannot establish past persecution in Mauritania. *See Vakeesan v. Holder*, 343 F. App'x 117, 124 (6th Cir. 2009) ("To the extent [that the petitioner's]

underlying asylum claim is based on past persecution, h[is] claim is precluded by the IJ's previous adverse credibility determination."). Ly offers no independent proof of the arrests he claims to have endured, and the IJ was correct not to find past persecution based on his testimony alone. Since Ly did not establish that he suffered past persecution, no rebuttable presumption of fear of future persecution exists in this case. *See id.* at 126 ("Absent the accounts of past persecution, the record is devoid of any evidence to suggest that [the petitioner] faces a reasonable possibility of being singled out individually for persecution . . . ." (citing *Zhang v. Mukasey*, 543 F.3d 851, 854–55 (6th Cir. 2008))). Therefore, in order for him to succeed in his asylum application at this point, he must otherwise prove that he has a well-founded fear of future persecution.

B.

Ly argues that substantial evidence does not support the BIA's and the IJ's finding that (1) a fundamental change occurred in the country conditions in Mauritania, (2) he lacked a well-founded fear of future persecution, and (3) he would not be tortured if removed to Mauritania. The IJ and the BIA found that Ly did not establish that he was persecuted in Mauritania and therefore there was no rebuttable presumption requiring the government to refute.

We have recently upheld findings in several cases that the changed country conditions in Mauritania reduce any objective fear of future persecution. *See Koita v. Mukasey*, 314 F. App'x 839, 843–44 (6th Cir. 2009) (holding that the free elections of 2006 and 2007 held in Mauritania constituted "substantial evidence support[ing] the BIA's determination that conditions in Mauritania have fundamentally changed"); *Sy v. Mukasey*, 278 F. App'x 473, 476 (6th Cir. 2008) ("Improving conditions in Mauritania since [the petitioner's] departure, however, doom his [asylum] petition.");

11

*Sall v. Gonzales*, 239 F. App'x 975, 981 (6th Cir. 2007) ("The 2003 State Department Report states that many of the former refugees have returned to Mauritania, that the Mauritanian government is cooperating with humanitarian groups to assist returning refugees, and that the government has returned property to many of the refugees[,]" which "supports the BIA's determination that changed circumstances bar [the petitioner's] application for asylum."). Ly does not offer any evidence contradicting the 2003 State Department Report other than the letters allegedly from his family members and his own testimony—all of which were deemed not credible as part of the adverse credibility finding. Therefore, Ly offers no evidence that the government would attempt to target him specifically as a member of a class—Fulani, Senegalese, or supporter of the opposition party—and he has established no objective fear of future persecution.

Although the BIA noted that Mauritania could potentially still gain from improvement in its social and political spheres, these possible shortcomings do not suggest a well-founded fear or likelihood that Ly will be persecuted or tortured upon return. Based upon the administrative record, substantial evidence supports the BIA's and IJ's findings and the denial of his application for asylum.

C.

Additionally, Ly asserts that the IJ and the BIA clearly erred in denying his claim for withholding of removal. In order to qualify for withholding of removal, an applicant must demonstrate that it is more likely than not that his "life or freedom would be threatened in [the] country [to which he would be removed] because of [his] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). This standard is more

stringent than the "well-founded fear" standard used in asylum claims. *Abay v. Ashcroft*, 368 F.3d 634, 637 (6th Cir. 2004). Therefore, if an applicant fails to establish that he is a "refugee" eligible for asylum, he necessarily fails to qualify for withholding of removal. *Id.*

As stated above, the record supported the IJ's ruling that Ly lacked credibility and that he did not meet his burden necessary for the court to grant his application for asylum. Because he did not satisfy the lower burden required in applying for asylum, his claim for withholding of removal also fails. *See id.* at 637.

## D.

Finally, Ly seeks protection under CAT. CAT provides that removal must be withheld if "it is more likely than not that [the applicant] would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). Under CAT, however, no protected-ground nexus is required to obtain relief as is required for asylum and withholding of removal claims. *Almuhtaseb v Gonzales*, 453 F.3d 743, 751 (6th Cir. 2006). The court shall consider "all evidence relevant to the possibility of future torture" to determine "whether it is more likely than not that an applicant would be tortured" upon removal to the designated proposed country. 8 C.F.R. § 208.16(c)(3)(i)–(iv). Such evidence can include past torture, the possibility to relocate the applicant to a location within the country where he would not likely be tortured, and the proposed country's record of human rights' violations. *Id.*

For the same reasons that support the denial of Ly's application for asylum and withholding of removal, Ly also fails to satisfy the requirement needed for CAT protection. He failed to show

13

he was tortured in the past, and he has not established that it would be more likely than not that he will be tortured in the future. For this reason, Ly's final claim for CAT protection also fails.

IV.

Ly contends that the IJ erred by admitting and relying on the asylum officer's notes in its denial of his asylum application. He also argues that admitting the notes when they were not previously furnished to him by the deadline established by local rules and without affording him an opportunity to cross-examine the asylum officer violated his Fifth Amendment right to due process. The BIA found no error in the IJ's admitting these documents.

The Federal Rules of Evidence are not controlling in administrative proceedings. *See Matter of Grijalva*, 19 I. & N. Dec. 713, 722 (B.I.A. 1988); *Matter of Velasquez*, 19 I. & N. Dec. 377, 380 (B.I.A. 1986). "[E]vidence is not inadmissible merely because it constitutes hearsay under those rules." *Ayyoub v. INS*, 93 F. App'x 828, 833 (6th Cir. 2004). Rather, "[t]he due process test for admissibility of evidence in a deportation hearing 'is whether the evidence is probative and whether its use is fundamentally fair.'" *Id.* (quoting *Felzcerek v. INS*, 75 F.3d 112, 115 (2d Cir. 1996)). "Hearsay evidence is admissible in an administrative proceeding, provided it is relevant and material." *Myers v. Sec'y of Health & Human Servs.*, 893 F.2d 840, 846 (6th Cir. 1990). In addition, "8 U.S.C. § 1186a(c)(4) explicitly provides that the BIA may consider '*any* credible evidence' relevant to an alien's application." *Ayyoub*, 93 F. App'x at 833–34.

The notes had some probative value, and their admission was not improper under the relaxed evidentiary rules applicable to immigration proceedings. Neither the IJ's decision not to require

strict adherence to local rule nor the absence of the asylum officer rendered the proceeding fundamentally unfair in violation of due process.

V.

For the foregoing reasons, we deny Ly's petition for review.