NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0859n.06

No. 10-3603

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Dec 19, 2011**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| FANTA SOW, et al., | ) | |
| | ) | |
| Petitioners. | ) | |
| | ) | |
| v. | ) | ON PETITION FOR REVIEW OF A |
| | ) | FINAL ORDER OF THE BOARD OF |
| ERIC H. HOLDER, JR., Attorney General of the United States, | ) | IMMIGRATION APPEALS |
| | ) | |
| | ) | |
| Respondent. | ) | |

Before: MERRITT, CLAY and SUTTON, Circuit Judges.

SUTTON, Circuit Judge. Fanta Sow and her two children challenge the denial of their application for asylum, withholding of removal and protection under the Convention Against Torture. Because substantial evidence supports the Board of Immigration Appeals' determination that Sow's claim of past persecution was not credible, we deny her petition for review.

I.

In Sow's 2002 asylum application, she claimed that her family fled Mauritania after government soldiers arrested them in July 1989. The soldiers took the Sows to a police station and held them there for a week, "mistreat[ing]" and "tortur[ing]" them because they are black. A.R. 387–88. Sow and her family fled to Senegal, where they lived for the next twelve years until 2001, when Sow and two of her children, Malik and Kany Sow, entered the United States.

Sow elaborated on this story during an interview with an asylum officer on September 29, 2003. Sow told the asylum officer that the soldiers arrested her and her husband while they were both at home and took them away, leaving their children behind. The soldiers beat her, burned her with cigarettes and called her a slave. She and her husband were deported to Senegal where they reunited with their children at a refugee camp.

The asylum officer concluded that Sow was not eligible for asylum because she did not establish by clear and convincing evidence that she applied for asylum within one year of arrival. *See* 8 U.S.C. § 1158(a)(2)(B). Sow claimed that she and her children traveled to the United States as stowaways on a ship from Senegal and arrived in Baltimore on June 20, 2001, but she offered no documentation proving they arrived on that date and her testimony about the details of the voyage was vague. The asylum officer referred Sow's application to an immigration judge.

Sow appeared before an immigration judge on March 4 and 8, 2008. She again testified about her 1989 arrest, but several details changed. This time Sow said that the soldiers arrested her and two of her young children—her husband was not at home—and the children stayed with her in captivity. Sow also said that one of the soldiers raped her, something she did not mention in her asylum application or interview.

In a written decision, the immigration judge rejected Sow's asylum claim for three reasons: (1) she did not establish that she applied for asylum within one year of entering the United States; (2) it was unclear whether she and her children were Mauritanian because she could not give a

consistent account of how she obtained Mauritanian identity documents; and (3) she did not establish past persecution because her testimony about the 1989 arrest conflicted with her asylum application and the story she told the asylum officer.

The Board of Immigration Appeals affirmed. It reasoned that the immigration judge did not commit clear error in finding that Sow's testimony about the 1989 arrest and about the origin of her Mauritanian identity documents was not credible.

II.

A careful reader might wonder at the outset: How can Sow and her children receive asylum if they fled Mauritania in 1989 and spent twelve years living in Senegal before entering the United States in 2001? This is a good question, but it is one we need not answer today because the Board denied Sow's asylum application on another ground, one that has substantial support in the record. To be eligible for asylum, Sow bears the burden of proving she is a "refugee"—that she "is unable or unwilling to return to" her country of nationality "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); *see* 8 U.S.C. § 1158(b)(1)(A). The Board concluded that Sow had not carried this burden because her claim of past persecution in Mauritania was not credible. We review the Board's decision together with the factual findings and credibility determinations made by the immigration judge on which the Board relied. *See Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). Those factual findings and credibility determinations "are conclusive

unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004).

Several discrepancies support the immigration judge's finding that Sow's claim of past persecution stemming from the 1989 arrest was not credible. These discrepancies go to the heart of Sow's claim, as they must to support an adverse-credibility determination for an asylum application filed before the effective date of the REAL ID Act. *El-Moussa v. Holder*, 569 F.3d 250, 256 (6th Cir. 2009). First, key details of the arrest evolved between Sow's interview with the asylum officer and her hearing before the immigration judge. Sow told the asylum officer one thing—that soldiers took her and her husband from their home and left their children behind. Yet she told the immigration judge another thing—that the soldiers took her and her two children and left her husband behind (because he was not at home at the time of the arrest). That is not a minor inconsistency and is hardly the kind of detail that one would forget when it comes to mistreatment of the applicant and her family. If the soldiers treated their prisoners as badly as Sow claims, the immigration judge could reasonably determine that this essential conflict in the accounts—about whether her two young children suffered through the experience with her—went to the heart of the claim and significantly undermined the credibility of her later account. This material difference in Sow's two accounts by itself supports the Board's decision.

Also problematic, though perhaps more understandable, is the evolution of Sow's story about her encounter with the soldiers. In her testimony before the immigration judge, she claimed that one of the soldiers raped her, a detail never mentioned in her asylum application, or in her interview with

the asylum officer. Sow, it is true, wrote in her asylum application that the soldiers subjected her to "mistreatment and torture." A.R. 388. But the asylum application directs applicants to explain past instances of mistreatment "in detail," A.R. 387, a requirement that surely requires some elaboration on what the nature of the mistreatment was. Even if asylum applicants need not provide an exhaustive list of all incidents supporting a claim of past persecution in the written application, *see Liti v. Gonzales*, 411 F.3d 631, 637–39 (6th Cir. 2005), that does not prevent an immigration judge from considering an applicant's failure to mention the most serious allegation of persecution in her application or in her asylum interview. *See Seydy v. Holder*, 413 F. App'x 799, 801 (6th Cir. 2011). The immigration judge could fairly conclude that the discrepancy about the rape, like the discrepancy about whether her children suffered through the mistreatment, suggested that Sow was trying to bolster her claim of past persecution through exaggerations and half-truths. *See Shkabari v. Gonzales*, 427 F.3d 324, 329 (6th Cir. 2005).

In an effort to justify these inconsistencies, Sow makes several points. She first argues that poor interpretation hampered her ability to communicate with the asylum officer. But other than pointing out that her language, Wolof, was not the interpreter's first language—unextraordinary on its own because interpreters by definition must use at least one language that is not their first—Sow identifies no actual instances of mistranslation. She even acknowledged during the hearing before the immigration judge that Wolof was the interpreter's second language and that he understood it.

Sow adds that her embarrassment and shame about the rape dissuaded her from disclosing it on her asylum application or from mentioning it in her interview. Sow relies on *Ben Hamida v.*

*Gonzales*, 478 F.3d 734 (6th Cir. 2007), where we said that an asylum applicant's failure to disclose to his wife and mother that guards threatened to sexually assault him was a largely irrelevant inconsistency because "shame about such events may cause the applicant to withhold details from loved ones." *Id*. at 739. But opting not to mention a shameful event to loved ones differs from voluntarily filing an asylum application with the government and opting not to disclose information that would support the claim—at least until later in the process. Even if we overlooked this alteration in Sow's account or credited Sow's explanation for it, however, that would not permit us to set aside the immigration judge's credibility determination. That her two accounts of the arrest could not keep straight whether her children were with her or not makes it exceedingly difficult to say that "any reasonable adjudicator" would be compelled to find that she was credible. 8 U.S.C. § 1252(b)(4)(B); *Yu*, 364 F.3d at 704. She has not met that burden.

Sow claims that the immigration judge erred by admitting into evidence the notes that the asylum officer took during her interview and the "assessment to refer," a written summary of the interview prepared by the asylum officer. The Federal Rules of Evidence do not constrain an immigration judge's authority to admit evidence, but the Fifth Amendment's guarantee of due process does. *Alexandrov v. Gonzales*, 442 F.3d 395, 404 (6th Cir. 2006). The admission of evidence during an asylum hearing comports with due process if the evidence is "probative" and "its use is fundamentally fair." *Kasa v. Gonzales*, 128 F. App'x 435, 440 (6th Cir. 2005). Sow does not dispute the probative value of the asylum officer's notes and the assessment to refer. Neither was their admission fundamentally unfair, which turns on "whether the evidence is trustworthy and

reliable" and whether the applicant receives a "meaningful [opportunity] to respond to the harmful evidence." *Id*. In the past, we have recognized that assessments to refer are not always the most reliable evidence; they are not after all an exact transcription of the asylum interview but an after-the-fact summary. *See Koulibaly v. Mukasey*, 541 F.3d 613, 620–21 (6th Cir. 2008). But Sow does not challenge the reliability of the assessment or the asylum officer's contemporaneous notes; most significantly, she does not argue that she told the asylum officer a story consistent with what she told the immigration judge and that the asylum officer simply wrote it down incorrectly. Admission of the asylum officer's notes and the assessment to refer did not violate her due-process rights.

In the absence of a credible case of past persecution, Sow does not benefit from a presumption that she has a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1); *Ceraj v. Mukasey*, 511 F.3d 583, 592 (6th Cir. 2007). Nor did Sow introduce any independent evidence demonstrating such a well-founded fear. The immigration judge also found that improvements in the Mauritanian government's respect for human rights reduce the likelihood that Sow will face persecution if she returns there, a finding we have upheld in several recent decisions involving asylum claims by Mauritanian nationals. *See, e.g.*, *Ly v. Holder*, 396 F. App'x 304, 310 (6th Cir. 2010); *Koita v. Mukasey*, 341 F. App'x 839, 843–44 (6th Cir. 2009); *Sy v. Mukasey*, 278 F. App'x 473, 476 (6th Cir. 2008). We thus see no error in the immigration judge's determination that Sow did not demonstrate a well-founded fear of future persecution.

The immigration judge also questioned whether Sow and her children are natives of Mauritania because, although Sow provided copies of a Mauritanian national identity card for herself

and Mauritanian birth certificates for her two children, she could not say where the originals of the documents were and could not give a consistent account about how she obtained photocopies. We need not decide whether this implicit finding that the Sows are not Mauritanian is supported by substantial evidence because Sow's failure to demonstrate a credible instance of past persecution or a well-founded fear of future persecution suffices to deny her petition for review.

Sow also seeks review of the Board's decision denying withholding of removal under 8 U.S.C. § 1231(b)(3) and the Convention Against Torture. To qualify for withholding under either provision, Sow must show "that it is more likely than not that" she would be persecuted or tortured. 8 C.F.R. §§ 1208.16(b)(2), (c)(2). Because Sow has not demonstrated a well-founded fear of future persecution, much less a fear of torture, she cannot satisfy the higher more-likely-than-not standard required to qualify for withholding of removal. *See Liti*, 411 F.3d at 640–41.

III.

For these reasons, we deny the petition for review.